IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

DEC 0 6 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| GARDEN CITY BOXING CLUB, INC., | § | |
| as Broadcast Licensee of the | § | |
| September 14, 2002, De La Hoya/Vargas Event, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. B-04-145 |
| | § | |
| 1) JOANN CRISTINA ZEPEDA, Individually | § | |
| and d/b/a LOS INDIOS SPORTS BAR a/k/a | § | |
| LOS INDIOS BAR; and | § | |
| 2) EDUARDO ZEPEDA, JR., Individually and | § | |
| d/b/a LOS INDIOS SPORTS BAR a/k/a LOS | § | |
| INDIOS BAR, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S MOTION FOR FINAL
## DEFAULT JUDGMENT AND BRIEF IN SUPPORT

TO THE HONORABLE PRESIDING JUDGE:

COMES NOW, Plaintiff Garden City Boxing Club, Inc. ("Plaintiff") and files this *Motion for Final Default Judgment and Brief in Support* respectfully showing the Court as follows:

### A. INTRODUCTION

1.      This is an "Anti-Piracy" case involving the Federal Communication Act of 1934, as amended (the "Communications Act"). The Communications Act combats against the piracy of radio and television signals. *See* 47 U.S.C. §§ 553[1] and 605.[2]   In this case, Defendants 1)

---

[1]  47 U.S.C. § 553 provides, *inter alia*, that:
      No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

Joann Cristina Zepeda, individually and d/b/a Los Indios Sports Bar a/k/a Los Indios Bar; and 2) Eduardo Zepeda, Jr., individually and d/b/a Los Indios Sports Bar a/k/a Los Indios Bar (collectively "Defendants") illegally intercepted the closed-circuit telecast of the September 14, 2002, Championship boxing match between Oscar De La Hoya and Fernando Vargas, including undercard and preliminary bouts (the "Event") and exhibited the Event in Defendants' Establishment, Los Indios Sports Bar a/k/a Los Indios Bar (the "Establishment"), without paying the licensing fee to Plaintiff.

### B. PROCEDURAL HISTORY

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. §§ 553 and 605 and venue is proper pursuant to 28 U.S.C. § 1391(b).

3.    On August 19, 2004, Plaintiff filed its *Complaint* (the "Complaint") against Defendants.[3]

---

[2] 47 U.S.C. § 605 provides, *inter alia*, that:

> [n]o person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

[3] Unless otherwise noted, Plaintiff requests that the Court take judicial notice of the matters set out in this Procedural History section, pursuant to FED. R. EVID. 201. *See Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277 (5th Cir. 1978) ("Courts are particularly apt to take notice of material in court files.") (citing WEINSTEIN & BERGER, WEINSTEIN'S EVIDENCE 48 (Supp. 1977)); *Walker v. Blackwell*, 360 F.2d 66, 71 (5th Cir. 1966) (Coleman, J., dissenting) ("It is elemental that we are entitled to take judicial notice of our own records and files."); *Huddleston v. Nelson Bunker Hunt Trust Estate*, 102 B.R. 71, 73 (N.D. Tex. 1989) (noting that district court may judicially notice its own files and records) (citing *Aloe Crème Laboratories, Inc. v. Francine Co.*, 425 F.2d 1295, 1296 (5th Cir. 1970)); *Thomas v. Esquivel*, 959 F. Supp. 396, 398 (N.D. Tex. 1997) (Fish, J.) (stating that the court can take judicial notice of its own records); *accord Van Woudenberg v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000) ("[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."); *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) ("In considering a

4.    On August 20, 2004, the Court issued its *Order for Conference and Disclosure of Interested Parties*.

5.    On October 25, 2004, Plaintiff filed two *Returns of Service* indicating that Defendants (individually and doing business as Los Indios Sports Bar a/k/a Los Indios Bar) were personally served with the *Summons* and *Complaint* on September 15, 2004, at 733 Eistetter, Laredo, Texas 78040.

6.    Defendants' answer or other responsive pleading was due on or before October 5, 2004.

7.    On or about November 29, 2004, Plaintiff filed *Plaintiff's Request for Entry of Default*.

8.    As of the date of this filing, Plaintiff has not received an answer or other responsive pleading from Defendants in this action and, upon information and belief, none has been filed with the Court.

9.    Defendants are not believed to be on active duty for any military service. *See Plaintiff's Request for Entry of Default Judgment*.

## C. Undisputed Evidence

10.    In the Appendix attached hereto, Plaintiff provides the following evidence to support a Final Default Judgment against Defendants:[4]

---

motion to dismiss, the court may take judicial notice of matters of public record outside the pleadings, including its own files from other cases.").

[4] Plaintiff also requests that the Court take judicial notice of its file in this action, specifically including *Plaintiff's Original Complaint*. *See* Fed. R. Evid. 201; *see also*, *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277 (5th Cir. 1978) (A court "shall take judicial notice if requested by a party and supplied with the necessary information").

Exhibit "A":  *Affidavit of Marcus W. Corwin*, including the following Exhibits:

    1.    *License Agreement* for the Event; and

    2.    *Affidavit of Rosa A. Lugo* ("Plaintiff's Auditor");

Exhibit "B":  *Affidavit of Andrew R. Korn*, including the following Exhibits:

    1.    Resume of Andrew R. Korn;

    2.    State Bar of Texas, Dept. of Research and Analysis: *1995 Attorney Billing and Compensation Survey*;

    3.    *Memorandum Opinion and Order* in *Entertainment by J&J, Inc. v. Nuno*, Civil Action No. 3:01-CV-0631-H, 2001 U.S. Dist. LEXIS 11050, at *2 (N.D. Tex. August 1, 2001);

    4.    State Bar of Texas, Dept. of Research and Analysis: *2001 Hourly Rate Report*;

    5.    Press Release dated July 8, 2003 from the *Altman Weil 2003 Survey of Law Firm Economics*; and

    6.    *Memorandum Opinion and Order* in *National Satellite Sports, Inc. v. Nancy Del Carmen Garcia d/b/a La Guira Night Club*, Civil Action No. 3:01-CV-1799-D; 2003 U.S. Dist. LEXIS 10315, at *8 (N.D. Tex. June 18, 2003).

Exhibit "C":  Selected Judgments from other anti-piracy cases in the Federal District Courts for the Southern District of Texas.

Exhibit "D":  Cited authority regarding post-judgment interest.

### AFFIDAVIT OF MARCUS W. CORWIN

11.    Exhibit "A":    Attached to the *Affidavit of Marcus W. Corwin*, a representative of Plaintiff, is a redacted copy of the *License Agreement* between Plaintiff and the promoter of the Event, providing Plaintiff with the exclusive right to license the exhibition of the Event to commercial establishments such as Defendants' Establishment. In addition, the *Affidavit of*

*Marcus W. Corwin* provides a basis for assessing an award of statutory damages under the Communications Act.

12.   Pursuant to the *Affidavit of Rosa A. Lugo*, Plaintiff's Auditor (the "Auditor") entered into Defendants' Establishment on the night of the Event and observed the Event being telecast to the patrons of Defendants' Establishment. *See* Exhibit "A" and Exhibit "2" attached thereto.

### AFFIDAVIT OF ANDREW R. KORN

13.   Exhibit "B":   The *Affidavit of Andrew R. Korn* establishes the reasonable and necessary attorneys' fees for prosecution of this action, as well as contingent awards of attorney's fees for post-trial legal services. *See* Exhibit "B."

### ANTI-PIRACY JUDGMENTS IN THE SOUTHERN DISTRICT

14.   Exhibit "C":   Exhibit "C" is a selection of anti-piracy judgments from Judges in the Southern District of Texas.

### D.  ARGUMENTS & AUTHORITIES

15.   Pursuant to *Plaintiff's Original Complaint*[5] and the evidence presented, the following facts are established:

- Plaintiff is in the business of marketing and licensing commercial exhibitions of pay-per-view prizefight events.

- Plaintiff possessed the proprietary rights to exhibit and sublicense the right to exhibit the Event.

---

[5] By Defendants' default, the Court should accept the well pleaded allegations of facts in the *Complaint. See e.g., Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200 (5th Cir. 1975); *Joe Hand Promotions, Inc. v. Sweet Williams Saloon, Inc.*, No. 97-730-C, 1997 U.S. Dist. LEXIS 20259, at *2 (E.D. La. December 15, 1997).

- Through a licensing agreement with the promoter of the Event, Plaintiff was licensed to exhibit the Event at closed circuit locations, such as theaters, arenas, clubs, lounges, restaurants and other commercial establishments throughout the State of Texas.

- In Texas, the Event was legally available to commercial establishments only through an agreement with Plaintiff.

- In order to safeguard against the unauthorized interception or receipt of the Event, the interstate satellite transmission of the Event was electronically coded or scrambled and was not available to or intended for the use of the general public. If a commercial establishment was authorized by Plaintiff to receive the respective Event, the establishment was provided with the electronic decoding equipment and the satellite coordinates necessary to receive the signal or the establishment's cable or satellite provider would be notified to unscramble the reception, depending upon the establishment's equipment and provider.

- Authorized commercial establishments which contracted with Plaintiff were required to pay to Plaintiff a sublicense fee to receive for the Event. This sublicense fee is typically based on the capacity of the establishment. The customary fee was based on twenty (20) times the maximum fire code occupancy of the commercial establishment purchasing the Event. For example, if an establishment had a maximum fire code occupancy of 150 persons, the fee would have been $3,000.00. In addition, it is customary that a minimum sublicense fee would apply for a commercial establishment to receive this Event in the amount of $1,000.00.

- On the date of the Event, without authorization, Defendants intercepted and received or assisted in the interception and receipt of the transmission of the Event, and broadcast or assisted in the broadcast of the Event to the patrons of the Defendants' Establishment. On the night of the Event, an Investigator observed the Event being telecast to the patrons of the Defendants' Establishment.

- Defendants could not have obtained the transmission of the Event had Defendants not undertaken specific wrongful actions to intercept, receive and/or exhibit the telecast of the Event.

## THE COMMUNICATIONS ACT

16.    The unauthorized interception and broadcast of either satellite or cable

transmissions violates both 47 U.S.C. §§ 553 and 605. *See, e.g.*:

- *International Cablevision, Inc. v. Sykes*, 75 F.3d 123, 131-33 (2d Cir.), *cert. denied*, 519 U.S. 929 (1996) (holding that claims of unauthorized broadcasts of cable television transmissions may be brought under both 47 U.S.C. §§ 553 and 605);

- *KingVision Pay-Per-View, Ltd. v. Jasper Grocery*, 152 F.Supp.2d 438, 442 (S.D.N.Y. 2001) ("[C]ourts in this district have regularly recognized that the telecasts licensed by the plaintiff are covered by the provisions of Section 605");

- *Entertainment by J & J, Inc. v. Nina's Rest. & Catering*, 2002 U.S. Dist. LEXIS 8908, 2002 WL 1000286, at *2-3 (S.D.N.Y. May 9, 2002) (determining that defendant's unauthorized interception and broadcast of a boxing match violated Sections 553 and 605 of the Federal Communications Act);

- *KingVision Pay-Per-View, Ltd v. 2182 La Caridad Rest., Inc.*, 2002 U.S.Dist. LEXIS 6934, at *8 (S.D. N.Y. April 18, 2002) (holding that defendant's unauthorized interception and broadcast of a boxing match violated Sections 553 and 605 of the Federal Communications Act);

- *Time Warner Cable of N.Y. City v. Taco Rapido Rest.*, 988 F. Supp. 107, 110 (E.D.N.Y. 1997) (determining that both provisions applied when defendant illegally intercepted and broadcast a pay-per-view boxing event); and

- *Home Box Office v. Gee-Co, Inc.*, 838 F. Supp. 436, 439 (E.D. Mo. 1993) (finding that defendant's unauthorized interception of cable communications services violated Section 553 and its unauthorized display of a satellite broadcast boxing event violated Section 605, where both violations were committed through the use of a satellite receiver with a "pirate chip" installed).

Accordingly, all acts of unlawful interception, receipt and broadcast of the signal of the Event

were in violation of the Federal Communications Act.

17.    A recent opinion from the Southern District of Texas acknowledges the intent of

Congress in trying to protect unauthorized telecasts:

> As an amendment and supplement to the Federal Communications Act,
> 'Congress enacted the Cable Communications Policy Act of 1984 to
> address 'a problem which is increasingly plaguing the cable industry—the
> theft of cable service.' The legislative history associated with section 553
> and the amendments to section 605 reveals [sic] that one of Congress's
> principal objectives was to discourage theft of cable services. Thus,
> Congress enacted a variety of penalties and remedies to 'protect the
> revenue of television cable companies from unauthorized reception of
> their transmissions.'

*Garden City Boxing Club, Inc. v. Al-Waha Enterprises, Inc.*, 219 F. Supp.2d 769, 773 (S.D. Tex.

2002) (citations omitted).

18.    In order to deter the unlawful use of communications such as the Event, Congress

specifically designed the Communication Act to provide "both prosecutor[s] and civil plaintiffs

[with] the legal tools they need to bring piracy under control." *See* Trademark & Satellite Acts,

Pub.L. No. 100-667, 1988 U.S.C.C.A.N. (102 Stat.), 5577, 5658; *see also*, *United States v. Scott*,

783 F. Supp. 280, 281 (N.D. Miss. 1992). Therefore, the Communication Act includes severe

penalties, both civil and criminal,[6] for those who intercept, receive and/or broadcast protected

communications. *See Scott*, 783 F.Supp. at 281. Moreover, Congress has equated a violation of

the Communication Act to theft of service. *See* Trademark & Satellite Acts, *supra* at 5642-43.

In 1988, in an effort to further deter theft, Congress amended the Communication Act to provide

for more severe penalties for violations. *Id.* at 5657.

19.    Accordingly, a party aggrieved under the Communication Act[7] may recover

statutory damages of up to $10,000.00 for violation of Section 553 and up to $10,000.00 for

---

[6] The criminal penalties include fines and imprisonment. *See* 47 U.S.C. §§ 553(b)(1) and (2); 47
U.S.C. § 605(e)(1) and (2).

[7] *See* 47 U.S.C. § 553(C)(1) and 47 U.S.C § 605(D)(6) (both statutes permit any person
aggrieved by a violation of the statute to bring a civil action to recover damages).

violation of Section 605.[8]  *See* 47 U.S.C. § 553(c)(3)(A)(ii) and 47 U.S.C. § 605(e)(3)(C)(i)(II).

Moreover, if the Court finds that the violation of the Communication Act was committed

"willfully and for purposes of direct or indirect commercial advantage or private financial

gain...," the Court may award additional damages of up to $100,000.00 for each violation under

47 U.S.C. § 605(e)(3)(C)(ii) and $50,000.00 under § 553(c)(3)(B).  Furthermore, pursuant to 47

U.S.C. § 605(e)(3)(B)(iii), a Court shall award full costs, including reasonably attorneys' fees.

20.     As Defendants owned and managed the Establishment, Defendants could not have

obtained the transmission of the Event had Defendants not undertaken specific wrongful actions

to intercept and/or receive and broadcast the telecast.  In order for an unauthorized commercial

establishment to receive a broadcast such as the Event, there must be some wrongful action, such

as using an unauthorized decoder, obtaining cable or satellite service and illegally altering the

cable or satellite service to bring the signal of the Event into the establishment or moving an

unauthorized decoder or satellite card from its authorized location to the establishment.  *See* the

*Affidavit of Marcus W. Corwin* at ¶¶ 7 and 10.  *See e.g.*, *KingVision Pay-Per-View, Ltd. v. Jasper*

*Grocery*, 152 F.Supp.2d 438, 442 (S.D.N.Y. 2001) (In order to access the telecast, it would have

been necessary to use an unauthorized decoder, to illegally divert cable service or improperly

relocate an authorized decoder.  "In any of the these scenarios, the illegality of the action would

have been apparent to the perpetrator"); *see also, Time Warner Cable v. Googies Luncheonette,*

*Inc.*, 77 F.Supp.2d 485, 490 (S.D.N.Y. 1999) (when finding willfulness the court stated, "There

can be no doubt that the violations were willful and committed for purposes of commercial

---

[8] *Spencer Promotions, Inc. v. 5th Quarter Enterprises, Inc.*, No. C 94-0988 CW, 1996 U.S. Dist. LEXIS 8686, at *19, 38 U.S.P.Q.2d (BNA) 1893 (N.D. Ca. Feb. 21, 1996) (Section 553 not meant to disturb the remedies under Section 605); *See also, Don King Productions/KingVision v. Maldonado*, No. C-97-3550 WHO MED, 1998 U.S. Dist. LEXIS 20165, at *4-6 (N.D. Ca. Dec. 11, 1998); *HBO v. Gee-Co., Inc.*, 838 F.Supp. 436 (E.D. Mo. 1993).

advantage and private gain. Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems") (emphasis added).

21.     To establish liability, all Plaintiff must show is that the Event was shown in Defendants' Establishment and that such exhibition was not authorized by Plaintiff. *See KingVision Pay-Per-View, Ltd. v. Lake Alice Bar*, 168 F.3d 347, 349 (9th Cir. 1999) (A finding that the bar showed a portion of an event was "the only finding that matters. It compels judgments in favor of KingVision").

STATUTORY DAMAGES UNDER
47 U.S.C. § 605(e)(3)(C)(i)(II)

22.     As its first basis for relief, Plaintiff requests statutory damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II). *See Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 850 (11th Cir. 1990).[9] Pursuant to the Communications Act, the amount of statutory damages to which Plaintiff is entitled for the violation shall be not less than $1,000.00 and not more than $10,000.00.

23.     For the reasons set forth herein, Plaintiff seeks statutory damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II) against Defendants in the amount of $10,000.00 for Defendants' violation of the Communications Act.

24.     As stated *supra* and supported by the Affidavits attached hereto, on date of the Event, Defendants or Defendants' agents, servants and/or employees intercepted and received or assisted in the interception and receipt of the live telecast of the Event. They then broadcast or

---

[9] It is in the Plaintiff's discretion whether to elect to receive actual or statutory damages. *Id. See also, Garden City Boxing Club, Inc. v. Al-Waha Enterprises, Inc.*, Civil Action No. H-01-2514, 2002 U.S. Dist. LEXIS 16247, at *17 (S.D. Tex. July 24, 2002) ("A majority of the courts that have dealt with a violation of both sections of the FCA award damages only under Section 605 because that provision allows for greater recovery for plaintiffs.") (citations omitted).

assisted in the broadcast of the Event to the patrons at Defendants' Establishment for viewing therein. The patrons at Defendants' Establishment purchased meals and/or drinks while viewing the Event. The patrons whom the Defendants permitted without authorization to view the Event would otherwise only have been able to view the Event at a commercial establishment by paying an admittance fee at an establishment authorized by Plaintiff to receive the transmission. The Defendants broadcast the Event to the patrons at Defendants' Establishment without paying any sublicense fees to Plaintiff.

25.    Statutory damages are appropriate where actual damages are difficult to prove. *Lauratex Textile Corp. v. Allton Knitting Mills, Inc.*, 519 F.Supp. 730, 732 (S.D.N.Y. 1981); *Lottie Jonlin Thomas Trust v. Crown Publishers, Inc.*, 592 F.2d 651, 657 (2d Cir. 1978). The lack of adequate proof of any particular element causes the Court to rely, within its discretion, on the statutory limitations. *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952). In the instant case, as more fully discussed *infra*, it would be impossible to determine the full extent of the profits lost by Plaintiff and the additional damages sustained by Plaintiff as a result of Defendants' unlawful actions. Accordingly, Plaintiff elects to receive statutory damages.

26.    Because the Statute defining statutory damage awards for violations of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act") is similar to the Communications Act, its case law is instructive for the determination of the amount of statutory damages to which Plaintiff is entitled.[10]

---

[10] 17 U.S.C. §504(c)(1) provides as follows:

> **Statutory damages.** (1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to

27.     According to the United States Supreme Court, when determining the applicable statutory damage award under the Copyright Act, the amount of profits lost by the copyright holder is not the only criteria for a Court to consider. *Woolworth*, 344 U.S. at 233. Rather,

> a rule of liability which merely takes away the profits from an infringement would offer little discouragement to infringers. It would fall short of an effective sanction for enforcement of the copyright policy. The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct. The discretion of the court is wide enough to permit a resort to statutory damages for such purposes. Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy.

*Id.* at 233.

28.     Statutory damages under the Copyright Act should serve to compensate the copyright owners and to provide a detriment to would be infringers. *Lottie Joplin Thomas Trust*, 592 F.2d at 657; *Lauratex*, 519 F. Supp. at 732. Factors to consider in determining a statutory damage award include: (1) "the market value of the rights infringed", (2) "the revenue lost by the plaintiff and profits gained by the defendant," (3) "the infringers state of mind" and (4) "deterrence of future infringement." *See Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F.Supp. 1522, 1544 (S.D.N.Y. 1991).

29.     The sublicense fees which Plaintiff charges to an authorized commercial establishment are based upon specific market factors, including but not limited to the marquee

---

recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum not less than $500 or more than $20,000 as the court considers just.

value of the boxing participants, the method of delivery to the residential consumer, the capacity

of the commercial establishment, and any guarantees required by the promoter.

30.     Applying the courts' analysis from their decisions under the Copyright Act, in the

instant case, the lost income from the sale of the Event to Defendants' Establishment represents

only a starting place for the determination of the amount of damages to which Plaintiff is entitled

for the Defendants' wrongful acts.

31.     When Congress enacted the Statute, it was specifically cognizant of the problems

of theft of various wire communications, including closed-circuit programming, such as the

Event. As stated in the House Bill:

>       The Committee is extremely concerned with a problem which is
>       increasingly plaguing the cable industry-the theft of cable service.
>       This problem has taken on many forms from the manufacture and
>       sale of equipment intended to permit reception of cable services
>       without paying for it, to apartment building dwellers "tapping" into
>       cable system wire in a building's hallway that issued for providing
>       service to a neighbor's apartment unit, to the sale by building
>       superintendents of cable converters left behind by previous tenants
>       to new tenants. Such practices does not only often permit one to
>       obtain cable service without paying the installation and hookup
>       costs, but also, for instance, involve individuals gaining access to
>       premium movie and sports channels without paying for the receipt
>       of those services.
>
>       Theft of services deprives the cable industry of millions of dollars
>       of revenue each year which it should otherwise be receiving. The
>       Committee believes that theft of cable service poses a major threat
>       to the economic viability of cable operators and cable
>       programmers, and creates unfair burdens on cable subscribers who
>       are forced to subsidize the benefits that other individuals are
>       getting by receiving cable service without paying for it.

Cable Communications Policy Act of 1984, House Report No. 98-934, 1984 U.S.C.C.A.N. §§ 5-

6, 4655, 4720. *See also, Cablevision Systems Corp. v. Maxie's North Shore Deli Corp.*, No. CV

88-2834, 1991 U.S. Dist LEXIS 4874 (E.D.N.Y. March 20, 1991) ("This section [553] was

meant to address the 'major problem' of theft of cable services.") (citing H.R. Rep., 934, 98th

Cong., 2d Sess. 83 (1984)).  Moreover, according to Congress, these incidents threaten to

undermine the satellite industry and adversely impact legitimate satellite dealers and satellite

programmers who otherwise would be receiving payment for their programming or descrambling

devices.  *See Scott*, 783 F.Supp. 280, 281 (*quoting* H. Rep. No. 98-934, *supra* 1984

U.S.C.C.A.N. at 4746).

      32.    The unauthorized interception, receipt and broadcast of the Event and other

closed-circuit programming threatens the viability of the closed-circuit industry.  There are no

countervailing social or policy considerations which justify the unauthorized interception of

these broadcasts.  *See e.g., ON/TV of Chicago v. Julien*, 763 F.2d 839, 843 (7th Cir. 1985);

*Subscription Television of Greater Washington v. Kaufman*, 606 F.Supp. 1540, 1544 (D.D.C.

1985); *see also, CSC Holdings, Inc. v. New Information Technologies, Inc.*, 148 F. Supp.2d 755,

759 at n.3 (N.D. Tex. 2001) ("Theft of cable services is a national epidemic with far reaching

consequences.  The loss of revenue to cable operators impacts their ability to purchase and

maintain high quality programming and reduces the amount of franchise fees paid to

governmental entities.  Maintenance of unauthorized connections and the use of pirate decoder

devices may result in signal leakage which violates FCC regulations.  This may subject a cable

operator to fines and other sanctions.  These considerations, among others, undoubtedly led

Congress to authorize the imposition of enhanced damages for willful violations of Section

553(a)(1).") (citations omitted).

      33.    In addition to the lost revenue which would have been derived from the delivery

and exhibition of the Event to Defendants' Establishment and its patrons, Plaintiff should receive

additional compensation to account for any profits gained by Defendants for meals and/or drinks

sold to the patrons as a indirect result of Defendants' unlawful acts. Moreover, Plaintiff should be further compensated as it has been deprived of the "value, benefits and profits derived" from the unauthorized broadcast of the Event to Defendants' establishment and its patrons as well as the value of "business investment, business opportunities and goodwill." *See American Television and Communications Corp. v. Floken, Ltd.*, 629 F.Supp. 1462, 1466 (M.D. Fla. 1986).

34.     The *Affidavit of Marcus W. Corwin* details the damages suffered by Plaintiff. As a result of theft by Defendants and others, Plaintiff has lost and will continue to lose as customers legitimate commercial establishments which are unwilling and financially unable to compete with those unauthorized commercial establishments, such as Defendants' Establishment, which steal sports and other closed-circuit programming. *See* the *Affidavit of Marcus W. Corwin* at ¶ 12. Because these unauthorized commercial establishments offer the stolen programming to their patrons for no fee or for a fee which is less than the authorized establishments are required to charge, the legitimate commercial establishments with the right to broadcast closed-circuit programming can not attract paying customers. *Id.* As a result, the authorized commercial establishments fail to recover the sublicense fees paid, suffer the loss of patrons and incur financial loss. *Id.* When the unauthorized commercial establishment advertises the availability of the stolen programming, the number of patrons at the unauthorized commercial establishment increases and, as a result, Plaintiff and the authorized commercial establishments suffer additional losses. *Id.*

35.     Theft of closed-circuit broadcasts, such as the Event, by unauthorized commercial establishments, such as Defendants' Establishment, adversely affects both Plaintiff and its customers. *See* the *Affidavit of Marcus W. Corwin* at ¶ 12. Plaintiff pays substantial fees to obtain the right to sublicense the broadcast of closed-circuit programming to authorized

commercial establishments. *Id.* Plaintiff's primary source of revenue is the sublicense fees which it charges to authorized commercial establishments for the right to broadcast closed-circuit sports and entertainment programming such as the Event. *Id.*

36.     Clearly, Defendants' actions have the potential to erode the base of Plaintiff's customers. Each patron of Defendants' Establishment is lost as a future patron of authorized broadcasts. *See Cox Cable Cleveland Area, Inc. v. King*, 582 F.Supp. 376, 381 (E.D. Ohio 1983). But for the Defendants' unauthorized broadcast of the Events, all or some of the patrons of Defendants' Establishment would have become paying patrons and directly increased the fees paid to Plaintiff by its authorized commercial establishments.

37.     Further, Plaintiff has suffered damage to its goodwill and reputation and loss of its right and ability to control and receive fees for the transmission of the Event. *See* the *Affidavit of Marcus W. Corwin* at ¶ 14; *see also, Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 640 F.Supp. 1159, 1161 (D. Ma. 1986) ("The unauthorized interception and exhibition of the [plaintiffs'] programs results in more than a loss of fees to the plaintiffs. It also deprives the plaintiffs of the full value of the business investment, costs them business opportunities, and has a negative impact on the plaintiffs' reputation and good will. [Plaintiff] has suffered and continues to suffer the loss of its right to control the reception of its communications.") (citations omitted). When negotiating sublicense fees, Plaintiff generally represents to legitimate commercial establishments the locations of other authorized commercial establishments licensed to receive the programming. *See* the *Affidavit of Marcus W. Corwin* at ¶ 14. Therefore, when an unauthorized commercial establishment intercepts, receives and broadcasts closed-circuit programming, such as the Event, Plaintiff's reputation and goodwill suffers from what appears like a misrepresentation. *Id.* Plaintiff should receive compensation from Defendants for these

losses suffered. Furthermore, an incalculable element of damages is the ill-will and possible loss of future business from legitimate commercial establishments which refuse to pay sublicense fees because they cannot compete with unauthorized commercial establishments which steal closed-circuit programming, such as the Event. *Id.*

38. The continued viability of Plaintiff as a business concern depends upon the willingness and ability of legitimate commercial establishments to pay sublicense fees for the right to broadcast closed-circuit sports and entertainment programming, such as the Event. *See* the *Affidavit of Marcus W. Corwin* at ¶ 15. If such programming is made available to the public for no fee at unauthorized commercial establishments which have not purchased the right to broadcast such programming, legitimate commercial establishments will find no reason to purchase the right to legally broadcast this type of programming. *Id.*

39. Plaintiff is operating a legitimate business of the type that Congress specifically sought to protect.[11] That protection, however, is threatened by Defendants' actions. This Court must use the full power of the Communications Act to punish Defendants for Defendants' acts of theft.[12] If rampant theft of service is allowed to go unpunished and Plaintiff and similar

---

[11] *See Entertainment by J&J, Inc. v. Al-Waha Enterprises, Inc.*, 219 F. Supp.2d 769, 773 (S.D. Tex. 2002) ("Congress enacted the Cable Communications Policy Act of 1984 to address 'a problem which is increasingly plaguing the cable industry – the theft of a cable service.") (citing *National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 911 (6th Cir. 2001) cert. denied 122 S.Ct. 1127 (2002); *see also*, Pamela B. Stuart, *Striking Back at Cable Pirates; Digital Millenium Copyright Act Imposes Tough Penalties on Signal Thieves*, FULTON COUNTY DAILY REPORT, September 30, 1999 ("Cable theft is regarded by the untutored as a benign offense-and by some as not a crime at all. Spam e-mails offer the prospect of unlimited pirated programming with an illegal descrambler. Even on television sitcoms, cable signal pilfering is portrayed as a harmless prank. That's about to change. Thanks to Congress, cable thieves and other intellectual property buccaneers may soon have to walk the plank-or end up in the brig. The Digital Millennium Copyright Act, which was signed into law on Oct. 28, 1998, includes significant criminal penalties for piracy of cable and satellite television signals").

[12] *See e.g.*, *U.S.A. v. Abboud*, 165 F. Supp.2d 987 (D. Neb. 2000) (Court permitted second criminal action against Defendants who had already pled guilty to 42 U.S.C.S. § 553 with sentencing remaining and payment of over 4.5 Million Dollars in fines and seizures); *U.S.A. v. Howard*, 13 F.3d

distributors of protected communications continue to suffer losses as a result of the theft, these businesses could be forced to curtail distribution of this programming, thereby depriving the people of the State of Texas of the ability to view these sports and entertainment events.

40.    Given the benefits which Defendants received from the broadcasts of the Event and given the additional damages which Plaintiff has suffered, it is fair and reasonable to assess against Defendants and award to Plaintiff statutory damages in the amount of $10,000.00 against Defendants for Defendants' violation of the Communications Act by the exhibition of the Event. Clearly, given the wrongfulness of Defendants' acts and the losses suffered by Plaintiff, it is entitled to these damages.

## DAMAGES FOR WILLFUL ACT
### UNDER 47 U.S.C. § 605(e)(3)(C)(ii)

41.    As its second basis for relief, Plaintiff requests damages pursuant to 47 U.S.C. § 605(e)(3)(c)(ii) because Defendants' actions were willful and "for purposes of direct or indirect commercial advantage or private financial gain." In *ON/TV of Chicago v. Julien*, 763 F.2d 839, 844 (7th Cir. 1985), the Court of Appeals for the Seventh Circuit interpreted willful under the Statute as "disregard for the governing statute and an indifference to its requirements." *Id.* at 844 (*quoting TransWorld Airlines, Inc. v. Thurston*, 469 U.S. 111, 127 (1985)).

42.    As set forth *supra*, Defendants have admitted an intentional exhibition of the Event for financial gain. Additionally, because of the absence of any way in which Defendants

1500 (11th Cir. 1994) (Defendants were convicted on three counts of assisting in the unauthorized decryption of satellite cable programming in violation of 47 U.S.C.S. § 605(e)(4). The Court found that Congress plainly contemplated that such programming would be received for private use by individuals with the necessary equipment and that Defendants were properly found to be involved in the unauthorized decryption of satellite cable programming. Joseph Howard, the father, was sentenced to 36 months in prison and fined $15,000. Joshua and Wayne Howard each received a prison sentence of 30 months and Wayne was fined $5,000).

could have "innocently" accessed the broadcast of the Event, it is apparent that Defendants specifically and willfully acted to illegally intercept the transmissions of the Event for Defendants' commercial advantage. Clearly, Defendants' actions indicate disregard of and indifference to the Communications Act. Defendants knew that it was wrong to receive, intercept and divert the signal of the Event and to broadcast it in Defendants' Establishment. *See KingVision Pay-Per-View, Ltd.*, 152 F.Supp.2d 438, 442 (S.D.N.Y. 2001); *see also, Time Warner Cable v. Googies Luncheonette, Inc.*, 77 F.Supp.2d 485, 490 (S.D.N.Y. 1999) (when finding willfulness the court stated, **"There can be no doubt that the violations were willful and committed for purposes of commercial advantage and private gain. Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems"**) (emphasis added). Yet, in total disregard of the Communications Act, Defendants intercepted and received the transmission and broadcast it to the patrons of Defendants' Establishment. Accordingly, Defendants' actions were willful and Plaintiff is entitled to additional damages.

43.     The Copyright Act provides this court with a further basis for finding that Defendants' actions were willful. Here too, because the damages for willful violations of the Copyright Act is similar to the Communications Act, the Copyright Act is again instructive for the instant case.[13]

44.     In *Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., Inc.*, 807 F.2d 1110 (2d Cir. 1986), *aff'd.*, 862 F.2d 304 (1988) the Court of Appeals for the Second Circuit analyzed

---

[13] The Copyright Act provides as follows:
(2) In a case where...court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $100,000. 17 U.S.C. §504(c)(2).

the criteria for determining whether actions constitute willful conduct. According to the Court, "a defendant's knowledge that its actions constitute an infringement [of the Copyright Act] establishes that the defendant acted willfully" within the meaning of the Copyright Act. *Id.* at 1115; *Fallaci v. New Gazette Literacy Corp.*, 568 F.Supp. 1172, 1173 (S.D.N.Y. 1983) (*citing* 3 *Nimmer on Copyright*, § 14.04 [B][3], at 14-27, 14-28 (1982). There is no need to prove malice or actual knowledge in order to establish a willful violation; constructive knowledge is sufficient. *See Fitzgerald*, 807 F.2d at 1115; *Cable/Home*, 902 F.2d at 851.

45.    In the instant case, Defendants' actual knowledge that Defendants' acts were wrongful should be sufficient to demonstrate that Defendants' acts were willful. *See KingVision Pay-Per-View, Ltd. v. Valles*, EP-CA-179-DB, 2001 U.S. Dist. LEXIS 24268, at *9 (W.D. Tex. March 30, 2001) (**"While Defendants may not have been well-versed in the statutory restrictions on the unauthorized interception of satellite transmissions, the Court finds that there must have been some knowledge on the part of Defendants that such interception could not be had for free."**) (emphasis added).

46.    Regarding the second prong of the damages test under 47 U.S.C. §§ 553(c)(3)(B) and 605(e)(3)(C)(ii), it is patently obvious that Defendants' actions were "for the purposes of direct or indirect commercial advantage or private financial gain." 47 U.S.C. §§ 553(c)(3)(B) and 605(e)(3)(C)(ii). As stated by Congress,

> [i]t is further intended that the term 'direct or indirect commercial advantage or private financial gain' be interpreted broadly by both the courts in deciding actions, and the Department of Justice in pursuing actions, under this section. Those who willfully violate subsection (a) and directly or indirectly enjoy commercial gain from those violations, may be reached.

Cable Communications Policy Act, P.L. 98-549, 5 U.S. Cong. News, '84 Bd. Vol.-8, 4745, 4750.

47.     Because the Event was broadcast to the patrons of Defendants' Establishment, Defendants' purpose and intent in exhibiting the Event was to secure a private financial gain and direct commercial advantage by misappropriating Plaintiff's licensed exhibitions and infringing upon Plaintiff's rights, while avoiding proper payment to Plaintiff.

48.     By interpreting the statutory language broadly as directed by Congress, the Court must find that Defendants' actions were for Defendants' commercial gain as set forth in the Communications Act.  Accordingly, as Defendants' actions were willful and for commercial advantage, Plaintiff is entitled to additional damages under the Communications Act.

49.     Generally, it is reasonable to increase an actual or statutory damages award by a specific percentage to penalize Defendants for willful acts.  *See e.g. Lauratex*, 519 F.Supp. at 733 (an increase of seven times the actual damages for willful acts); *Cablevision Systems Corp. v. Maxie's North Shore Deli Corp.*, 1991 WL 58350, No. CV 88 2834 (ASC) (E.D.N.Y. 1991) (the court awarded five times the statutory damages for willful violations); *Cable/Home*, 902 F.2d 829 (additional damages of five times actual damages for willful conduct); *Joe Hand Promotions, Inc. v. Al-Waha Enterprises, Inc.*, 219 F. Supp.2d 769, 777 (S.D. Tex. 2002) (the court awarded three times statutory damages for willful violations.)

50.     As a willful violator of the Communications Act, Defendants must be held accountable for a substantial amount above the market value of the sublicense fees to broadcast the Event.  Otherwise, other commercial establishments "would be encouraged to violate the law knowing the full extent of their liability would not exceed what they would have to pay for a license on the open market." *See Fallici v. New Gazette Literary Corp.*, 568 F.Supp 1172, 1174 (S.D.N.Y. 1983).

51.    Under the Copyright Act, "when the infringement is willful, deterrence of future

violations is a legitimate consideration' because 'Defendants must not be able to sneer in the face

of copyright owners and copyright laws'." *Cable/Home*, 902 F.2d at 851 (*quoting Int'l Korwin

Corp. v. Kowalczyk*, 855 F.2d 375, 383 (7th Cir. 1988); *See also Chi-Boy Music v. Charlie Club,

Inc.*, 930 F.2d 1224, 1230 (7th Cir. 1991). Similarly, in the instant case, the award of additional

damages must be sufficiently significant to deter Defendants and other unauthorized commercial

establishments from stealing protected communications.

52.    In addition to the reasons set forth *supra*, Plaintiff seeks five (5) times the

statutory damages awarded under the Communications Act in the amount of Fifty Thousand and

00/100 Dollars ($50,000.00) for the following reasons:

- To deter future pirating of cable and satellite broadcasts. *See e.g.,
  KingVision Pay-Per-View, Ltd. v. Scott E.'s Pub, Inc.*, 146 F.Supp.2d 955,
  959-60 (E.D.Wis. 2001) (discussing multipliers of three to eight times the
  statutory damages as additional damages in order to deter future
  communication theft).

- To deter actions involving theft, fraud and conversion. *See Joe Hand
  Promotions, Inc. v. Tia Maria Mexican Restaurant & Cantina, Inc.*, 97 F.
  Supp.2d 775, 778-779 (S.D. Tex. 2000) ("A suit for illegal reception and
  broadcast of a cable signal implicates several areas of the law [including
  fraud and theft]."); *ProStar v. Massachi*, 239 F.3d 669, 675 (5th Cir. 2001)
  (analogizes violation under Communications Act to conversion); *see also,
  Gren Industries, Inc. v. Brown*, No. 05-98-01368-CV, 2001 Tex. App.
  LEXIS 1190, at *20 (Tex. App.—Dallas February 26, 2001) ("We believe
  the conversion shown by the evidence is precisely the kind of wrongdoing
  that punitive damages were meant to punish and deter.").[14]

- To deter crimes involving deception and moral turpitude. *See Bryant v.
  State*, 997 S.W.2d 673, 676 (Tex. App.—Texarkana 1999, no pet); *Okoro
  v. INS*, 125 F.3d 920, 926 (5th Cir. 1997) (It has been acknowledged that
  crimes of theft, however they may be technically translated into domestic
  penal provisions, are presumed to involve moral turpitude). Theft has

---

[14] Unpublished cases are not cited as authority, but for illustrative purposes only.

been abhorred by Texans for generations and is so fundamentally wrong, that to say so, appears to state the obvious. *See Rio Securities Co. v. Wassell*, 64 F.Supp. 881, 884 (S.D.Tex. 1946) ("It is hardly necessary to state the law applicable to the facts disclosed by this record. It has long been known and recognized by mankind throughout the ages. It is written in the Ten Commandments, on the Twelve Tables, in the laws of every nation, and in the heart of every man.") (citations omitted); *Nourse v. State*, 2 Tex. Ct. App. 304 (1877) (The crime imputed to appellant, like swindling, embezzlement, theft from the person, theft from a house, and theft of animals, belongs to the evil family of theft in general). Courts must do what they can to prevent and deter cable and satellite piracy. *See e.g., Houston & North Texas Motor Freight Lines, Inc. v. Local No. 745 Int'l Bro. of Teamsters, Chauffeurs, Stablemen and Helpers of America*, 27 F.Supp. 262, 265 (N.D.Tex. 1939) ("The disobedience then becomes an offense against government and society, which the courts must notice and punish, since to leave the evil example unnoticed and unpunished would soon lead to the subversion of order, and the establishment of anarchy in its stead").

- To prevent and punish "morally wrong" acts. *See In re Birdwell*, 20 S.W.3d 685, 688 (Tex. 2000) (crimes involving moral turpitude are those based on "dishonesty, fraud, deceit, misrepresentation, or deliberate violence"); *Godwin v. Jessell*, No. 05-99-01824-CV, 2001 Tex. App. LEXIS 883, at *8 (Tex. App.—Dallas February 9, 2001) (... "we conclude that torts involving knowing dishonesty, misrepresentation, and deceit are, as a matter of law, "morally wrong"); *United States v. Rodriguez*, 942 F.2d 899 (5th Cir. 1991) (Court affirmed Judge Hinojosa's sentence of 33 months in prison for making a false statement during the acquisition of a firearm); *State of Louisiana v. Nicholas*, 735 So.2d 790, 802 (La. App. 1999) (Court affirmed life sentence against defendant that the trial court called a "Twentieth Century pirate who has preyed upon society his entire life [that] has never contributed anything positive to our society."); *Lackey v. State*, 881 S.W.2d 418, 420 (Tex. App.—Dallas 1994, writ denied) (Defendant sentenced to thirty-five years in prison for theft of property with value less than $750 under three time offender rule) (citing *Rummel v. Estelle*, 445 U.S. 263, 284, 63 L.Ed.2d 382, 100 S.Ct. 1133 (1980) (Defendant was sentenced to life in prison under recidivist statute for the offense of obtaining $120.75 by false pretenses); *Schalk v. State*, 823 S.W.2d 633 (Tex. Crim. App. 1991) (Two employees sentenced to two years in prison and fined $5,000.00 each for theft of trade secrets from their employer).

53.    Accordingly, it is proper for this Court to award to Plaintiff additional damages in

the amount of five times the actual damages sought against Defendants in the amount of Fifty

Thousand and 00/100 Dollars ($50,000.00) to compensate Plaintiff for Defendants' intentional acts in exhibiting the Event.[15]

## ATTORNEYS' FEES

54.    Plaintiff requests an award of attorneys' fees and costs pursuant to 47 U.S.C. §§ 553(c)(2)(C) and 605(e)(3)(B)(iii). Pursuant to Sections 553(c)(2)(C) and 605(e)(3)(B)(iii), the award of attorney's fees is mandatory. Pursuant to Section 605(e)(3)(B)(iii), "[t]he Court... shall direct the recovery of full costs, including awarding reasonable attorneys' fees..."

55.    Plaintiff seeks an award of one third of the actual and additional damages awarded to Plaintiff for the prosecution of this action through the final Judgment requested in the amount of Twenty Thousand and 00/100 Dollars ($20,000.00). *See* the *Affidavit of Andrew R. Korn* (Exhibit "B"). Courts have recognized that a one-third contingent fee is reasonable for the prosecution of anti-piracy cases. *See* the *Memorandum Opinion and Order* in *Entertainment by J&J, Inc. v. Nuno*, Civil Action No. 3:01-CV-0631-H, 2001 U.S. Dist. LEXIS 11050, at *2 (N.D. Tex. August 1, 2001) attached as Exhibit "B-3". In addition, such an award prevents the request for attorney's fees from becoming an unduly complicated matter for the Court. *See Nisby v. Commissioner's Court of Jefferson*, 798 F.2d 134, 137-38 (5th Cir. 1986) (Hinojosa, J., concurring) ("In a system burdened with increased caseloads, it is inappropriate and unnecessary to make a request for attorney's fees an unduly complex matter. The attorney's fees issue should not become a second complicated lawsuit. To determine the amount of an attorney's fee award,

---

[15] This is even more so, if there were not a large number of patrons in Defendants' Establishment. The smaller establishments are more likely to pirate an event than pay the substantial minimum licensing fee. Judges of this District have routinely entered large awards against "small" establishments. *See e.g.*, Appendix at Exhibit "C."

district courts should be given standards which are fair, simple and easily reviewable on appeal for abuse of discretion").

56.    Plaintiff also seeks a contingent award of attorney's fees in the event certain post-trial, pre-appeal and appellate services, in the event such services are rendered and do not lead to the a reversal of the Judgment obtained as follows:[16]

a.    Ten Thousand Dollars ($10,000.00) in the event a Defendant files a motion to vacate, Rule 60 motion, motion for new trial, motion for reconsideration or other post-judgment, pre-appeal motion that does not result in a reversal of the Judgment obtained in this action;

b.    Fifteen Thousand Dollars ($15,000.00) in the event a Defendant files an appeal to the Fifth Circuit Court of Appeals that does not result in a reversal of the Judgment obtained in this action;

c.    Five Thousand Dollars ($5,000.00) for making and/or responding to a petition for certiorari to the U.S. Supreme Court that does not result in a reversal of the Judgment obtained in this action;

d.    Ten Thousand Dollars ($10,000.00) for an appeal to the United States Supreme Court in the event a petition for certiorari review is granted and does not result in a reversal of the Judgment obtained in this action; and

e.    Two Thousand Dollars ($2,000.00) for collection of the Judgment rendered in this case, should Plaintiff obtain a writ of execution, writ of garnishment, writ of attachment or other process.

<u>INTEREST</u>

57.    Plaintiff also requests post-judgment interest at 5.00%, which is the current bank prime rate. *See* www.federalreserve.gov/releases/h15/current. This rate of interest is a

---

[16] The Court may award fees for appellate work on a contingent basis. *See Lyn-Lea Travel Corp. v. American Airlines, Inc.*, Civil Action No. 3:96-CV-2068, 2000 U.S. Dist. LEXIS 14487, at * 33 (N.D. Tex. September 29, 2000) (vacated on other grounds, 283 F.2d 282 (5th Cir. 2002) citing *Norris v. Hartmax Specialty Stores, Inc.*, 913 F.2d 253, 257 (5th Cir. 1990) ("A long and consistent line of Fifth Circuit precedent allows awards of attorney's fees for both trial and appellate work.") (citations omitted).

reasonable amount. *See e.g., KingVision Pay-Per-View, Ltd. v. Valles*, 2001 U.S. Dist. LEXIS 24268 at *10 (W.D. Tex. 2001) (awarding 6.052% pre-judgment interest and 4.17% post-judgment interest) (citing *"Williams v. Trader Publ'g. Co.*, 218 F.3d 481, 488 (5th Cir. 2000) (holding that '[a] district court has discretion to impose a pre- and post-judgment interest award to make a plaintiff whole' at the rate determined by the court); *see also Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991) (holding that 'it is within the discretion of the district court to select an equitable rate of prejudgment interest.').")"; *see also*, the *Default Judgment* in Civil Action No. EP-00-CA-161-DB, *Prostar v. Valles*, In the United States District Court for the Western District of Texas, El Paso Division (Feb. 8, 2001) (awarding 6% post-judgment interest); and the *Final Judgment* in Civil Action No. 3:01CV-1803-R, *Entertainment by J&J, Inc. v. Cantu*, In the United States District Court for the Northern District of Texas, Dallas Division (Dec. 10, 2002) (awarding post-judgment interest at the prime rate – 4.25%). *See* Exhibit "D" for a copy of the authority above. Applying any lower federal rate is incongruous, as a judgment against Defendants is not nearly as "safe" an investment and cannot be as freely sold or pledged.

## CONCLUSION

58.     The need for substantial awards to compensate those aggrieved under the Communications Act and to deter Defendants and similar individuals and entities has already been recognized in this jurisdiction and other jurisdictions.

## PRAYER

For the reasons set forth herein, Plaintiff respectfully requests that Plaintiff recover the following:

(1)     Statutory damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II) from Defendants, jointly and severally, in the amount of $10,000.00;

(2)     Additional damages pursuant to 47 U.S.C. § 605(e)(3)(C)(ii) from Defendants, jointly and severally, in the amount of $50,000.00;

(3)     Attorneys' fees from Defendants, jointly and severally, in the amount of $20,000.00 for prosecution of this case through this Judgment along with the attorney's fees for post-trial and appellate services sought herein;

(4)     Costs and post-judgment interest at the highest lawful rate; and

(5)     Such other and further relief to which Plaintiff is entitled.


Respectfully submitted,


By: _____
        Andrew R. Korn
        State Bar No. 11683150
        Southern District Bar No. 13801

KORN, BOWDICH & DIAZ, L.L.P.
4221 Avondale Avenue
Dallas, Texas 75219
(214) 521-8800 – Telephone
(214) 521-8821 – Telecopy
www.kbdtexas.com

ATTORNEYS FOR PLAINTIFF
GARDEN CITY BOXING CLUB, INC.

## CERTIFICATE OF SERVICE

Pursuant to FED. R. CIV. P. 5(b) and Southern District of Texas Local Rule 5.5, I certify

that a copy of this document was served on the 29th day of November, 2004 as follows:

Joann Cristina Zepeda                   VIA U.S. CERTIFIED MAIL
Individually and d/b/a                   RRR# 7003 3110 0000 8801 5296
Los Indios Sports Bar a/k/a Los Indios Bar
733 Eistetter
Laredo, Texas 78040

Eduardo Zepeda, Jr.                     VIA U.S. CERTIFIED MAIL
Individually and d/b/a                   RRR# 7003 3110 0000 8801 5302
Los Indios Sports Bar a/k/a Los Indios Bar
733 Eistetter
Laredo, Texas 78040

DEFENDANTS

By: _____
       ANDREW R. KORN