IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GARDEN CITY BOXING CLUB, INC., <br> as Broadcast Licensee of the <br> September 14, 2002, De La Hoya/Vargas Event, <br><br> Plaintiff, <br><br> v. <br><br> 1) JOANN CRISTINA ZEPEDA, Individually <br> and d/b/a LOS INDIOS SPORTS BAR a/k/a <br> LOS INDIOS BAR; and <br> 2) EDUARDO ZEPEDA, JR., Individually and <br> d/b/a LOS INDIOS SPORTS BAR a/k/a LOS <br> INDIOS BAR, <br><br> Defendants. | § § § § § § § § § § § § § § § § § | Civil Action No. B-04-145 |

## AFFIDAVIT OF MARCUS W. CORWIN

| | |
|---|---|
| STATE OF FLORIDA | § <br> § |
| COUNTY OF PALM BEACH | § |

BEFORE ME, the undersigned authority, on this day personally appeared Marcus W. Corwin, who is personally known to me or presented a valid Florida driver's license to verify his identity, and who, after first being duly sworn under oath, deposes and states as follows:

1. "My name is Marcus W. Corwin, I am the President of Secure Signal, Inc. I am more than 21 years of age; I am of sound mind; and I am competent to make this Affidavit and to testify to the matters stated herein.

2. The statements contained herein are true and correct and within my personal knowledge or the knowledge of Secure Signal, Inc. and from a review of Secure Signal, Inc.'s investigation file for Defendants 1) Joann Cristina Zepeda, Individually and d/b/a Los Indios

AFFIDAVIT OF MARCUS W. CORWIN                                                                                      Page 1
n:\901299\pdg\Affidavit-Corwin [SS# 02-0914DV-TX-128

Sports Bar a/k/a Los Indios Bar; and 2) Eduardo Zepeda, Jr., Individually and d/b/a Los Indios Sports Bar a/k/a Los Indios Bar (collectively "Defendants") (the "Establishment").

3. Plaintiff Garden City Boxing Club, Inc. ("GCBC" or "Plaintiff") hired Secure Signal, Inc. to assist Plaintiff with regard to certain infringement matters (including the discovery, investigation and prosecution of claims arising from the theft or piracy of closed-circuit television programming, including the September 14, 2002 Championship boxing match between Oscar De La Hoya and Fernando Vargas, from the Mandalay Bay Hotel and Casino in Las Vegas, Nevada, including undercard or preliminary bouts (the "Event").

4. Plaintiff is in the business of marketing and licensing commercial exhibitions of pay-per-view prizefight events. Plaintiff possessed the proprietary rights to exhibit and sublicense the right to exhibit the closed-circuit telecast of the Event to commercial establishments such as Defendants' Establishment.

5. Plaintiff was licensed to exhibit the Event at closed circuit locations, such as theaters, arenas, clubs, lounges, restaurants and other commercial establishments throughout the State of Texas. A true and correct copy of the License Agreement (with confidential information redacted) for the Event is attached hereto as Exhibit "1" and incorporated herein.

6. In Texas, the Event was legally available to commercial establishments only through an agreement with Plaintiff.

7. In order to safeguard against the unauthorized interception or receipt of the Event, the interstate satellite transmission of the Event was electronically coded or scrambled and was not available to or intended for the use of the general public. If a commercial establishment was authorized by Plaintiff to receive the Event, the establishment was provided with the electronic decoding equipment and the satellite coordinates necessary to receive the signal or the

establishment's cable or satellite provider would be notified to unscramble the reception of the Event for the establishment, depending upon the establishment's equipment and provider.

8. Authorized commercial establishments which contracted with Plaintiff were required to pay to Plaintiff a sublicense fee to receive the Event. This sublicense fee for the Event was based on the capacity of the establishment. Typically, this fee is based on twenty (20) times the maximum fire code occupancy of the commercial establishment purchasing the Event for a Championship boxing match such as the Event. For example, if an establishment had a maximum fire code occupancy of 150 persons, the fee would have been $3,000.00. In addition, there typically is a minimum sublicense fee for a commercial establishment to receive the Event in the amount of $1,000.00.

9. On September 14, 2002, without authorization, Defendants' intercepted and received or assisted in the interception and receipt of the transmission of the Event, and broadcast or assisted in the broadcast of the Event to the patrons of Defendants' Establishment. On the night of the Event, an auditor observed the Event being telecast to the patrons of the Defendants' Establishment. A true and correct copy of the *Affidavit of Rosa A. Lugo* ("Plaintiff's Auditor") regarding the Event and Defendants' Establishment is attached hereto as Exhibit "2" and incorporated herein.

10. In order for an unauthorized commercial establishment to receive a broadcast such as the Event, there must be some wrongful action, such as using an unauthorized decoder, obtaining cable or satellite service and illegally altering the cable or satellite service to bring the signal of the Event into the establishment or moving an unauthorized decoder or satellite card from its authorized location to the establishment. Defendants could not have obtained the

transmission of the Event had Defendants not undertaken specific wrongful actions to intercept, receive and/or exhibit the telecast of the Event.

11. In addition to lost licensing fees, Defendants' patrons purchased food and/or drinks while viewing the Event. But for Defendants' pirating of the Event, its patrons would have had to view the Event at a commercial establishment authorized by Plaintiff to receive and exhibit the transmission.

12. As a result of theft by the Defendants and others, Plaintiff has lost and will continue to lose as customers, legitimate commercial establishments which are unwilling and financially unable to compete with those unauthorized commercial establishments, such as Defendants' Establishment, which steal sports and other closed-circuit programming. Because these unauthorized commercial establishments offer the stolen programming to its patrons for no fee or for a fee which is less than the authorized establishments may have charged, the legitimate commercial establishments with the right to broadcast closed-circuit programming cannot attract paying customers. As a result, the authorized commercial establishments fail to recover the sublicense fees that they paid, lose patrons and incur financial loss. When an unauthorized commercial establishment advertises the availability of the pirated programming, the number of patrons at the unauthorized commercial establishment increases and, as a result, Plaintiff and the authorized commercial establishments suffer additional loss.

13. A major source of Plaintiff's revenue is the sublicense fees which it charges to authorized commercial establishments of the right to broadcast closed-circuit sports and entertainment programming, such as the Event. Defendants' actions have eroded the base of Plaintiff's customers. Each patron of Defendants' Establishment is lost as a future patron of authorized broadcasts. But for Defendants' unauthorized broadcast of the Event, all or some of

the patrons of Defendants' Establishment would have become paying patrons and directly increased the fees paid to Plaintiff by their authorized commercial establishments.

14. Further, Plaintiff has suffered damage to their goodwill and reputation and loss of its right and ability to control and receive fees for the transmission of the Event. When negotiating sublicense fees, Plaintiff generally represents to legitimate commercial establishments the location of other authorized commercial establishments licensed to receive the programming. Therefore, when an unauthorized commercial establishment intercepts, receives and exhibits closed circuit programming, such as the Event, Plaintiff's reputation and goodwill suffers from what appears like a misrepresentation. Furthermore, an incalculable damage is the ill-will and possible loss of future business from legitimate commercial establishments which refuse to pay sublicense fees because they cannot compete with unauthorized commercial establishments which pirate closed-circuit programming, such as the Event.

15. The continued viability of Plaintiff as a business concern depends upon the willingness and ability of legitimate commercial establishments to pay sublicense fees for the right to broadcast closed-circuit sports and entertainment programming, such as the Event. If such programming is made available to the public for no fee at unauthorized commercial establishments which have not purchased the right to broadcast such programming, legitimate commercial establishments will find no reason to purchase the right to legally broadcast this type of programming.

16. Because the Event was broadcast to the patrons of Defendants' Establishment, Defendants' only purpose and intent in exhibiting the Events was to secure a private financial gain and direct commercial purposes by misappropriating Plaintiff's licensed exhibitions and infringing upon Plaintiff's rights while avoiding proper payment to Plaintiff.

17. As a willful violator of the Communications Act, Defendants must be held accountable for a substantial amount above the market value of the sublicense fees to broadcast the Event. Otherwise, other commercial establishments would be encouraged to violate the law knowing the full extent of its liability would not exceed what they would have to pay for a license on the open market. The award of damages must be sufficiently significant to deter Defendants and other unauthorized commercial establishments from pirating protected communications.

18. I am a custodian of records for Secure Signal, Inc. Attached hereto are Exhibits "1" and "2" that are business records of Secure Signal, Inc. These records are kept by Secure Signal, Inc. in the regular course of business, and it was the regular course of business of Secure Signal, Inc. for an employee or representative of Secure Signal, Inc., with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached are the original or exact duplicates of the original."

---
MARCUS W. CORWIN, PRESIDENT
SECURE SIGNAL, INC. FOR
GARDEN CITY BOXING CLUB, INC.

SUBSCRIBED AND SWORN TO BEFORE ME, an officer authorized to administer oaths, on the 24th day of November, 2004, to certify which witness my hand and official seal.

---
Notary Public, in and for the State of Florida

My Commission Expires:
Feb. 25, 2005

Elizabeth R. Anderson
Printed Name of Notary Public



OFFICIAL NOTARY SEAL
ELIZABETH R ANDERSON
COMMISSION NUMBER
CC994438
MY COMMISSION EXPIRES
FEB. 25, 2005

AFFIDAVIT OF MARCUS W. CORWIN
n:\901299\pdg\Affidavit-Corwin [SS# 02-0914DV-TX-128

Page 6