TOP RANK, INC.
SUITE 580
3980 HOWARD HUGHES PARKWAY
LAS VEGAS, NEVADA 89109
(702) 732-2717

as of January 22, 2002

Garden City Boxing Club, Inc.
2380 South Bascom Avenue, Ste. 200
Campbell, CA 95008

Attention: J.M. Gagliardi

RE: CLOSED CIRCUIT TELEVISION LICENSE AGREEMENT

Oscar De La Hoya v. Fernando Vargas
Scheduled 12 round Junior Middleweight Championship Bout

Plus selected undercard bouts
(fighters subject to change)

Mandalay Bay Resort & Casino
Las Vegas, Nevada
Saturday, September 14, 2002

Gentlemen:

This will confirm the terms of our agreement whereby TOP RANK, INC. ("TR") and NEW JERSEY SPORTS PRODUCTIONS, INC., d/b/a MAIN EVENTS ("ME"), as co-promoters (collectively referred to herein as "Promoter") hereby grant to you ("you" or "Licensee") the exclusive license to exhibit, only within the fifty states of the United States of America (the "Territory"), Promoter's live telecast of the captioned bout and accompanying undercard matches (the "Event"), simultaneously with the Event, only at commercial closed circuit television exhibition outlets, such as theaters, bars, clubs, lounges, restaurants and the like, each with a fire code occupancy capacity not to exceed 500 persons per outlet, located within the Territory. The exhibition rights granted herein do not include any rights in the Commonwealth of Puerto Rico, Mexico or Canada, or transmissions to hotel guest rooms, in-flight aircraft or other transportation facilities. The Territory shall not include, and you shall have no exhibition rights in, Clark County, Nevada, except for Laughlin, Nevada where you shall have such rights.

- 1 -

**REDACTED**

1. <u>License Fee</u>. As full and complete compensation for the rights granted you by Promoter, you shall pay to Promoter the license fee calculated as follows:

   The Minimum Financial Guarantee of _____ as provided in Paragraph 2, PLUS _____ of the amount of all gross revenues payable to Licensee in excess of the first _____ which Licensee receives from all closed circuit television exhibitions of the Event in the Territory.

   (a) All amounts which are to be deducted or withheld by your sublicensee exhibitors, sales agents or distributors from payments to you or your sublicensees shall be subject to the mutual agreement of Promoter and Licensee but shall not exceed _____ of gross revenues from each outlet from exhibition of the Event.

   (b) In the event that you should sublicense an outlet for a fixed lump sum or for a license fee which includes a guaranteed amount which is not exceeded by your share of revenues from that outlet, you shall include in gross revenue hereunder the amount equal to such lump sum or guarantee.

   (c) You shall be entitled to deduct and withhold, for advertising and publicity purposes, 10% of gross revenues from exhibition locations which you license directly to operators without any commission or distribution fee to third party sales agents or distributors.

   (d) You shall provide the services of a duly authorized representative of your organization who shall be present at each licensed and sublicensed outlet immediately prior to and during the telecast of the Event, to monitor compliance with the terms of this agreement and report on attendance figures and the collection of admission fees.

   (e) Promoter shall be responsible for the cost of advertising materials, such as posters, press kits and slides, in amounts and quantities to be mutually agreed upon by Promoter and Licensee.

   **Payment of all license fee amounts in excess of the Minimum Financial Guarantee shall be due and payable to Top Rank Inc. and Main Events, on behalf of the co-promotion, not later than ten (10) business days after the Event.**

2. <u>Minimum Financial Guarantee</u>. As a minimum guarantee and non-refundable advance against the monies due to Promoter pursuant to Paragraph 1 of this agreement, you shall pay to Promoter the sum of _____
Dollars, by delivery to Top Rank Inc. on behalf of the co-promotion, not later than **August 27, 2002** of either

   (a) a certified check or bank cashier's check payable to Top Rank, Inc. and Main Events in such amount; or

(b) an irrevocable letter of credit payable to Top Rank, Inc. and Main Events in such amount, subject to collection, in the form annexed as an exhibit hereto. Such letter of credit shall be collateral security for your payment of such minimum financial guarantee, shall be issued or confirmed by a member bank of the U.S. Federal Reserve System, which bank shall be subject to the advance approval of Top Rank, Inc. in its discretion, and shall be payable at the counters of Bank of America, 300 South 4th Street, 3rd Floor, Las Vegas, Nevada 89119. All bank charges and fees shall be for your account.

3. <u>Compatible Decoding Equipment</u>. You and your sublicensees shall be responsible to obtain, as your or their cost and expense, either

(a) Authorization to receive the Event through the services of one or more direct satellite suppliers ("DSS"), such as DirecTV or Echostar, to be selected by you and approved by Promoter in writing in advance;

(b) If Promoter licenses TVN to distribute the Event by C-Band and so notifies Licensee, authorization to receive the Event through TVN;

(c) DSS and TVN, if applicable, shall be responsible for the encoding and decoding of their retransmitted signals; or

(d) You shall not charge decoder rental or authorization fees to your sublicensees in excess of $100 per decoder or authorization. Any additional equipment charges to your sublicensees shall be at your cost.

4. <u>Addressing of Decoders</u>.

(a) Promoter shall deliver either (1) the encrypted transmission of the video and audio signal of its telecast of the Event to a domestic satellite or other delivery point from which the signal is capable of being received by DSS and TVN, for redistribution to your designated outlets or (2) by fibre optic cable to a delivery point at which the signal is capable of being received by DSS and TVN, for redistribution to your designated outlets. DSS and TVN, if applicable, as the case may be, shall have the responsibility to address and authorize decoders for your authorized sublicensees. You shall be responsible for all charges for addressing and authorizing your sublicensees.

(b) Promoter shall have no responsibility for your decoder authorization fees, and Promoter shall have no responsibility or liability to you or your sublicensees for any technical failures which may occur in connection with the authorizing of decoders for your sublicensed closed circuit exhibition outlets or in connection with any retransmission or authorizing by DSS.

(c) You shall instruct DSS and TVN, if applicable, to provide directly to Promoter, on the first business day after the Event Date, their complete final sublicense reports

-3-

which shall indicate the name, address and city of each sublicensed outlet and the decoder number for each sublicensed outlet.

5. <u>Pay-Per-View Exhibitions</u>.

You acknowledge that Promoter shall license the live cable television and direct broadcast satellite television exhibition of the Event in the Territory on a pay-per-view basis and that you shall have no interest or participation in such pay-per-view exhibition.

6. <u>Anti-Piracy</u>.

You and your sublicensees shall promptly advise Promoter of any piracy (i.e., unauthorized use or proposed use) of the telecast in the Territory. Promoter and Licensee, acting jointly, shall have the right to commence or settle any claim or litigation arising out of the alleged piracy, use or proposed use of the telecast in the Territory. Promoter and Licensee shall notify each other in writing and shall consult with each other and mutually agree before commencing or settling any such claim or litigation in the Territory. Any damages, whether statutory, compensatory, punitive or otherwise, which Promoter and/or Licensee may recover from the theft, piracy, copying, duplication, unauthorized exhibition or transmission of the Event in the Territory, after payment of reasonable legal fees and disbursements, shall constitute gross revenues from the Event, to be shared by Promoter and Licensee as provided in Section 1 of this Agreement. Licensee shall advance any required legal fees and disbursements, subject to recoupment from any applicable recovery, and shall report all expenses, settlements and recoveries to Promoter on a quarterly basis. Your sublicensees shall have no right to commence or settle any claim or litigation arising out of the alleged piracy of the telecast hereunder without the prior written consent of Promoter.

7. <u>Private Showings</u>. Promoter shall have the right, at its cost and expense and upon written notice to you, to conduct or authorize others to conduct two (2) complimentary private showings of the telecast of the Event in each state within the Territory, for an audience not to exceed 125 persons at each location, with no admission charge and no advertising or advance publicity for such private showings.

8. <u>Attachments</u>. Annexed to this agreement as exhibits are the following documents, the terms and conditions of which are incorporated herein as if set forth in their entirety:

(a) <u>Closed Circuit Television Sublicense Agreement</u> which you and your sublicensee shall complete and sign with respect to each closed circuit television outlet you may sublicense. YOU SHALL NOT ENTER INTO ANY SUCH AGREEMENT WITHOUT FIRST OBTAINING, PRIOR TO THE TELECAST OF THE EVENT, THE WRITTEN CONSENT AND APPROVAL OF Promoter TO THE TERMS THEREOF AND WITHOUT OBTAINING THE COUNTER-SIGNATURE OF Promoter ON THE SUBLICENSE AGREEMENT.

(b) <u>Closed Circuit Television Standard Terms and Conditions</u> which shall apply to this agreement as well as to the Closed Circuit Television Sublicense Agreement. YOU SHALL ATTACH A COPY OF THE STANDARD TERMS AND CONDITIONS TO EACH SUCH SUBLICENSE AGREEMENT.

9. <u>Defaults</u>.

(a) Your failure to deliver the Minimum Financial Guarantee as provided in paragraph 2 hereof or to pay the license fee as provided in Paragraph 1 hereof or to pay the signal delivery fees or equipment expenses as provided in Paragraph 3 hereof or to comply with any other material term or condition of this agreement or of the annexed agreements or the Standard Terms and Conditions shall permit Promoter, in addition to all of its other rights and remedies, to cancel this agreement with you at any time without any further liability or obligation to you and to retain all monies paid to Promoter prior to such cancellation. Provided, however, that before Promoter may exercise any remedy with respect to any such default, Promoter must (i) provide License with written notice specifying such default and (ii) if and to the extent that time reasonably permits prior to the Event, provide Licensee with up to seven (7) days after Licensee's receipt of such default notice within which to cure such default.

(b) If, in violation of the provisions of this agreement, you or a sublicensee exhibits the Event in an outlet with a fire code occupancy limit in excess of 500 persons (except casino locations), then, in addition to the license fee for such outlet as provided in Paragraph 1, and in addition to and not in limitation of or in lieu of any other rights or remedies Promoter may have under this agreement, at law or in equity, including, without limitation, Promoter's rights to indemnification hereunder, Licensee shall immediately pay to Promoter an amount equal to the following for each such outlet that violates the aforesaid restriction: the sum of the fire code occupancy capacity of the outlet multiplied by 50% of the face amount of the highest ticket or admission price for the Event at that outlet. You agree that this payment is reasonably calculated to reimburse Promoter for its damages in the event of such violation of this agreement.

10. <u>No Packaging with Other Events</u>.

You shall not sublicense closed circuit television rights to the Event to exhibitors as part of a package which includes other boxing programs or bouts not included in this Event without the prior written consent of Promoter.

11. <u>Reports, Collection and Accounting</u>.

(a) You shall be responsible for collection of all monies from outlets, and shall make all payments and provide all reports pursuant to paragraph 4 of the Closed Circuit Television Standard Terms and Conditions and shall provide Promoter with copies of all reports received from sublicensed outlets. You shall distribute to Promoter all amounts due for exhibition rights to the Event, with no deductions, set-offs or holdbacks whatsoever.

(b) In addition to the reports required in the Closed Circuit Television Standard Terms and Conditions, you shall provide Promoter with:

- 5 -

Separate reports no later than 24 hours before the Event and 24 hours following the Event, including the name, location and license fee for each closed circuit exhibition outlet and including the information required in paragraph 10(d) of the Closed Circuit Television Standard Terms and Conditions;

Promoter's representatives shall have the right to visit your offices and each outlet at any time during normal business hours prior to the Event and after the Event to obtain and verify such information, in person or electronically, and to make arrangements for the payment of all license fees due to Promoter promptly following the Event.

All checks shall be payable to, and contracts and reports shall be sent to:

Top Rank, Inc.  
Suite 120  
400 Garden City Plaza  
Garden City, New York 11530-3344  
Attn: Michael N. Malitz  

and to: Main Events  
390 Murray Hill Parkway  
East Rutherford, NJ 07073  

12.  **Entire Agreement.**  This agreement supercedes and terminates all prior agreements between the parties hereto and their affiliates with respect to the subject matter contained herein, and this agreement embodies the entire understanding between the parties relating to such subject matter, and any and all prior correspondence, conversations and memoranda are merged herein and shall be without effect hereon.

Very truly yours,

TOP RANK, INC.

By: _____  
Authorized Signature

NEW JERSEY SPORTS PRODUCTIONS, INC.

By: _____  
~~Gary Shaw, Chief Operating Officer~~

- 6 -

Please confirm your agreement with the above by signing and returning the attached copy of this letter. This Television License Agreement shall not become effective unless and until Promoter has accepted and signed this agreement and returned one copy to you.

ACCEPTED AND AGREED:

Garden City Boxing Club, Inc.

By: _____
      Joseph M. Gagliardi
      President

BY SIGNING THIS AGREEMENT, LICENSEE ACKNOWLEDGES HAVING READ THE STANDARD TERMS AND CONDITIONS AND CONFIRMS ITS AGREEMENT THERETO. NO CHANGES ARE AUTHORIZED IN THE STANDARD TERMS AND CONDITIONS.

EXHIBITS

A. Sample Form of Letter of Credit

B. Closed Circuit Television Sublicense Agreement

C. Closed Circuit Television Standard Terms and Conditions



- 8 -

TX 128

## AFFIDAVIT:

COUNTY OF ► **Webb**        STATE OF ► **Texas**

BEFORE ME, the undersigned authority, on this day personally appeared
(Name of auditor) ► **Rosa A. Lugo**
And after being first duly sworn according to law, deposes and states as follows

**(1).** My name is ► **Rosa A. Lugo**        I am over the age of eighteen (18) years, of sound mind, competent to testify as to the matters contained herein, personally acquainted with the facts stated herein, and state that they are true and correct

**(2).** I am currently employed by: **Audit Masters**

**(3).** At approximately ► **9:50 P.M.** on Saturday September 14th 2002
(if after Midnight, enter correct day date and time)
I entered: (Name of establishment) ► **Los Indios Bar**

(Full Address, City State and Zip) ► **1002 Sanders, Laredo Texas,**

At that time, I observed that (name of establishment) ► **Los Indios Bar**

Was displaying the **Oscar De La Hoya Vs. Fernando Vargas** boxing match and/or its under

card preliminary bouts. I took a head count at this time and counted approximately

► **20 persons inside the establishment.** I also noticed there were

(number of) ► **1**    televisions and/or monitors for viewing by patrons inside this

establishment

**(4)** The television monitor(s) displayed the following (the identity of any boxing activity witnessed, specifically, if applicable, names of fighters, color of boxing trunks, round number, time remaining in round; and logos as they appear on the microphones, ring mat, ring posts or television screen ▼ ▼ ▼
I saw people milling about the ring waiting for the decision on the outcome between Cotto and Brown, Unanimous decision goes to Cotto, Graphic of final punch stats with pictures of Cotto and Brown, Larry Merchant Wearing a Black Tux and Holding an HBOPPV Mike Interviews Cotto through an Interpreter.

BY ► _[signature]_ ◄ (signature of auditor)

► **ROSA A. LUGO** ◄ (Printed name of auditor)
       *DATED ► **24th** ◄ Day of, September 2002

*SWORN TO AND SUBSCRIBED THIS ► **24th** ◄ Day of September 2002

Notary Public in and for the State of: ► **TEXAS**    ◄ MY COMMISSION EXPIRES ►

► _[signature]_ ◄ (Signature of Notary Public)

- Please Note! This is a legal Document, it has to be typed,
- Both Signature and Notary Dates *must be entered and be same date*

Affidavit is incomplete and unacceptable unless it has the checklist attached, thank you.

ISABEL L. ALMANZA
MY COMMISSION EXPIRES
June 23, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GARDEN CITY BOXING CLUB, INC., <br> as Broadcast Licensee of the <br> September 14, 2002, De La Hoya/Vargas Event, <br><br> Plaintiff, <br><br> v. <br><br> 1) JOANN CRISTINA ZEPEDA, Individually <br> and d/b/a LOS INDIOS SPORTS BAR a/k/a <br> LOS INDIOS BAR; and <br> 2) EDUARDO ZEPEDA, JR., Individually and <br> d/b/a LOS INDIOS SPORTS BAR a/k/a LOS <br> INDIOS BAR, <br><br> Defendants. | § § § § § § § § § § § § § § § § § § | Civil Action No. B-04-145 |

## AFFIDAVIT OF ANDREW R. KORN

| | |
|---|---|
| STATE OF TEXAS | § <br> § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Andrew R. Korn, who is personally known to me or presented a valid Texas drivers license to verify his identity, and who, after first being duly sworn under oath, deposes and states as follows:

1.  "My name is Andrew R. Korn, I am more than 21 years of age; I am of sound mind; and I am competent to make this Affidavit and to testify to the matters stated herein.

2.  The statements contained herein are true and correct and within my personal knowledge as an attorney licensed to practice law in the State of Texas and as an attorney representing Plaintiff Garden City Boxing Club, Inc. ("Plaintiff").

3. My current resume (along with an attachment explaining Martindale Hubbell's rating system), containing an overview of my experience as an attorney, is attached hereto as Exhibit "1."

4. I have attended legal seminars, including the *Annual Legal Ethics Seminar* presented by the DBA CLE COMMITTEE AND LEGAL ETHICS COMMITTEE, April 10, 2003, Dallas, Texas, where the topic discussed was attorneys' fees. I have set over two hundred fifty fee agreements for legal services. I have handled hundreds of collection cases and attended seminars on debt collection. Since 2001, my firm has handled (or is in the process of handling) in excess of four hundred (400) anti-piracy cases, including federal district courts in the Northern, Southern and Western Districts of Texas.

5. Based upon my experience, knowledge and training, reviewing the factors contained in TEX. DISC. R. PROF. CONDUCT 1.04 and *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) with which I am familiar, the work performed in this case, with which I am familiar, and *State Bar of Texas Department of Research and Analysis, 1995 Attorney Billing and Compensation Survey* (a copy of which is attached hereto as Exhibit "2") it is my opinion that a one third (33 1/3%) contingent fee is reasonable for the prosecution of this cause through judgment. In particular, based on Defendant's poor financial condition (based on our asset research and public records searches) and the criminal nature of pirating cable and satellite transmissions, the difficulty of fully collecting a judgment appears high and the likelihood of fully collecting a judgment appears low.

6. In addition, Courts have recognized that a one-third contingent fee is reasonable for the prosecution of anti-piracy cases. *See* the *Memorandum Opinion and Order* in

*Entertainment by J&J, Inc. v. Nuno*, Civil Action No. 3:01-CV-0631-H, 2001 U.S. Dist. LEXIS 11050, at *2 (N.D. Tex. August 1, 2001) which is attached hereto as Exhibit "3."

7. The reasonable attorneys' fee of one-third is determined solely on how I perceive the factors listed in TEX. DISC. R. PROF. CONDUCT 1.04 as applied to this case, and not against all my cases, and not using risk shifting or "pooling" between my cases.

8. Solely in the alternative to the one-third contingent fee sought for the prosecution of this action through the Default Judgment, and for any "*Lodestar* fee" calculation, Plaintiff estimates that attorneys representing Plaintiff in this action reasonably expended a minimum of six (6) hours on this litigation through the preparation of Plaintiff's Motion for Default Judgment. Based on the factors and documents identified herein, it is my opinion that a blended rate of $250.00 per hour is reasonable for anti-piracy litigation such as this case for a total fee in the amount of $1,500.00. In determining the $250 per hour fee, I also considered the *State Bar of Texas Department of Research & Analysis, 2001 Hourly Rate Report* (a copy of which is attached hereto as Exhibit "4") and the July 8, 2003, press release by Altman Weil, Inc. recognizing the $250/hour as the median hourly fee for an equity partner as determined from the *Altman Weil 2003 Survey of Law Firm Economics* (a copy of which is attached as Exhibit 5). This $250 per hour fee for prosecution of anti-piracy cases was recently approved by one Judge in the Northern District of Texas. See *National Satellite Sports, Inc. v. Nancy Del Carmen Garcia d/b/a La Guira Night Club*, Civil Action No. 3:01-CV-1799-D; 2003 U.S. Dist. LEXIS 10315, at *8 (N.D. Tex. June 18, 2003) attached hereto as Exhibit "6."

9. It is also my opinion that the following attorneys' fees are reasonable for each of the following:[1]

   a. Ten Thousand Dollars ($10,000.00) in the event a Defendants files a motion to vacate, Rule 60 motion, motion for new trial, motion for reconsideration or other post-judgment, pre-appeal motion that does not result in a reversal of the Judgment obtained in this action;

   b. Fifteen Thousand Dollars ($15,000.00) in the event a Defendants files an appeal to the Fifth Circuit Court of Appeals that does not result in a reversal of the Judgment obtained in this action;

   c. Five Thousand Dollars ($5,000.00) for making and/or responding to a petition for certiorari to the U.S. Supreme Court that does not result in a reversal of the Judgment obtained in this action;

   d. Ten Thousand Dollars ($10,000.00) for an appeal to the United States Supreme Court in the event a petition for certiorari review is granted and does not result in a reversal of the Judgment obtained in this action; and

   e. Two Thousand Dollars ($2,000.00) for collection of the Judgment rendered in this case, should Plaintiff obtain a writ of execution, writ of garnishment, writ of attachment or other process.

_____
ANDREW R. KORN

SUBSCRIBED AND SWORN TO BEFORE ME, an officer authorized to administer oaths, on the 23rd day of November, 2004, to certify which witness my hand and official seal.



My Commission Expires:
08-13-08

_____
Notary Public, in and for the State of Texas

Catherine Barrera-Austin
Printed Name of Notary Public

---

[1] The Court may award fees for appellate work on a contingent basis. *See Lyn-Lea Travel Corp. v. American Airlines, Inc.*, Civil Action No. 3:96-CV-2068, 2000 U.S. Dist. LEXIS 14487, at * 33 (N.D. Tex. September 29, 2000) (vacated on other grounds, 283 F.2d 282 (5th Cir. 2002) citing *Norris v. Hartmax Specialty Stores, Inc.*, 913 F.2d 253, 257 (5th Cir. 1990) ("A long and consistent line of Fifth Circuit precedent allows awards of attorney's fees for both trial and appellate work.") (citations omitted).

AFFIDAVIT OF ANDREW R. KORN                                                                 Page 4
n:\901299/pdg/Affidavit-Korn [SS# 02-0914DV-TX-128]