**KORN BOWDICH & DIAZ**
L.L.P.

# Andrew R. Korn



**Andrew R. Korn** is a partner in the law firm of Korn, Bowdich & Diaz L.L.P.

akorn@kbdtexas.com

**read interview with Andy**

Andy Korn is Board Certified in Civil Appellate Law by the Texas Board of Legal Specialization.

Andy has an AV rating from the Martindale-Hubbell Law Directory, the highest rating given. He is admitted to practice before the United States District Courts for the Northern, Southern, Eastern and Western Districts of Texas and the Fifth Circuit.

Andy has more than twelve years of experience in commercial litigation, securities litigation and arbitration, tort litigation, constitutional law and employment law, including accountant liability, advertiser liability, brokerage liability, security guard liability, personal injury, legal malpractice, libel, slander, DTPA, consumer law, landlord-tenant, breach of contract, copyright and trademark litigation, business torts, Fair Labor Standards Act, sexual harassment, wrongful termination, employment discrimination, collections, enforcement of deed restrictions and non-compete agreements. Andy has argued cases in the Court of Appeals for the Tenth District of Texas at Waco, the Court of Appeals for the Fifth District of Texas at Dallas and the United States Fifth Circuit Court of Appeals.

Andy has represented institutions such as Southwestern Bell Mobile Systems, Inc., KPMG Peat Marwick, and Credit Suisse First Boston Mortgage Capital, LLC. Andy has represented such well known individuals as Anthony Robbins, former All-Pro Dallas Cowboy Nate Newton and Senator Florence Shapiro. Since 1999, Andy has arbitrated four NASD securities cases to award and two cases to award before the American Arbitration Association. Andy has represented brokerages, brokers, and customers in securities related disputes.

Andy has appeared to discuss his cases on *FOX 4 News*, in *The Dallas Morning News*, the *Dallas Business Journal*, *San Antonio Express– News*, and the *Tampa Tribune*. Andy is the former co-host on the weekly radio show "Politics Today" which aired on 50,000 watt, Talk 1190 AM, Saturday mornings from 9:00 a.m. – 10:00 a.m. Andy is a former Republican Precinct Chairman of Precinct 3307 in Dallas County, Texas. Andy has attended various campaign schools including, The Leadership Institute's Grassroots Activist School, The Texas Federation of Republican Women's Campaign Management School and The Republican National Committee's Women Who Win Campaign School. Andy also served as the Dallas Area Judicial Leadership Chairman for the Republican Victory '98 Campaign.



Andy was born in Brooklyn, New York on May 7, 1965. He received his B.A., cum laude, from the University of Pennsylvania in 1986 and his J.D. from Vanderbilt University School of Law in 1989. During Andy's third year of law school, he interned with the Davidson County District Attorney's Office, where he assisted in the prosecution of misdemeanors. Andy was admitted to practice in Texas in 1989. Andy was an associate and participating associate in the Litigation Section of the Dallas office of Fulbright & Jaworski, L.L.P. from 1989-1994.

Andy's nickname is the "Gator."





The
Martindale-Hubbell™
Rating System

# How It Works

MARTINDALE-HUBBELL
A Member of LEXIS Publishing

---

Martindale-Hubbell®
the Respected
Standard for
Over a Century.

MARTINDALE-HUBBELL™
A Member of LEXIS Publishing™
121 Chanlon Road
New Providence, NJ 07974
1-800-526-4902
Email: ratings@martindale.com
http://www.martindale.com

*Please retain this brochure for future reference.*

CV, BV and AV are registered certification marks of Reed Elsevier Properties Inc., used under license.

MARTINDALE-HUBBELL is a service mark and a registered trademark of Reed Elsevier Properties Inc., used under license. LEXIS and NEXIS are registered trademarks of Reed Elsevier Properties Inc., used under license.

RT0302C

---

Dear Colleague:

To provide you with a better understanding of the Martindale-Hubbell Rating System, we have developed this summary for your reference. It is our hope that it will help you as part of your question about how we conduct ratings.

It is also our hope that you will complete our ratings inquiry forms when received and return them to us as soon as possible. Your opinion is important to us and we rely on your confidential recommendations concerning fellow lawyers under inquiry to ensure that initiating continue to be a cooperative service.

I would like to personally thank you for your involvement in the ratings process.

Sincerely,

Edward J. Roycroft
Vice President, Ratings

---

# Martindale-Hubbell™ Ratings

**CV**
An excellent first rating and a definitive statement of a lawyer's above average ability and unquestionable ethics.

**BV**
An indication of an exemplary reputation and well-established practice. A typical attorney is in mid-career, with a significant client base and high professional standing.

**AV**
An AV rating reflects an attorney who has reached the heights of professional excellence. He or she has usually practiced law for many years, and is recognized for the highest levels of skill and integrity.

For over 130 years, Martindale-Hubbell® has been the most respected source of authoritative and dependable information about members of the legal community in the United States, Canada and throughout the world.

An integral part of this service to the legal community is the Martindale-Hubbell Rating System. Under this system, Legal Ability and General Ethical Standards Ratings for individual attorneys are developed and published in the Martindale-Hubbell database. The goal of this impartial rating system is the development of unbiased, fair and accurate ratings for as many lawyers as possible, including both subscribers and nonsubscribers of Martindale-Hubbell.

## ATTORNEY RATINGS

The majority of rating reviews are initiated by Martindale-Hubbell, typically beginning five years after an attorney has been admitted to the Bar. An initial review of a lawyer is also made when requested by the attorney or at the request of a partner or colleague. There are no minimum periods of admission to the practice required for any rating.

There are many lawyers for whom no ratings are published. Some have requested not to have a rating published. For others, definitive information has not been developed because of the relatively few years the lawyer has practiced, the size of the Bar or other reasons unrelated to the individual's professional competence, reliability or ethical standards. The lawyer's practice is limited or specialized; it may afford little opportunity for others to form a professional opinion. Therefore, absence of ratings should not be construed as unfavorable.

## LAW FIRM RATINGS

Reviews are not conducted of law partnerships or professional corporations. The rating extended to a law firm depends on the lawyer personnel and the ratings published for those individuals. Generally, a law firm is given the rating of its highest rated principal. The rating of a firm has no bearing on the individual rating of any lawyer connected with it.

## THE RATING INQUIRY PROCESS

Martindale-Hubbell solicits confidential opinions from members of the Bar, including those who have ratings and those who do not. In addition, members of the judiciary are queried.

Opinions are solicited via written questionnaires and by Martindale-Hubbell field representatives who conduct on-the-spot, oral interviews. No rating is ever established or altered solely on the basis of a field representative's report. Before definitive action is taken, confidential written inquiries are solicited.

All inquiries seek to elicit recommendations based on personal knowledge of the lawyer under inquiry. Martindale-Hubbell does not undertake to make an evaluation of a lawyer's scholastic background, types of clients represented, the number and kinds of cases handled or participation in professional or community activities. The rating process is recognized as a cooperative service to the Bar; participants are not compensated in any way.

## SCOPE OF THE RATING SYSTEM

Ratings fall into two categories: Legal Ability and General Ethical Standards. A rating must be established in both categories to be published.

### Legal Ability Rating

The Legal Ability Rating takes into consideration the standard of ability for the area where the lawyer practices, the attorney's expertise, the nature of practice and qualifications relevant to the profession. Where a lawyer's practice is specialized, rating opinions are made on the basis of performance in those specific fields of law.

Legal Ability Ratings are:

C — Good to High
B — High to Very High
A — Very High to Preeminent

### General Ethical Standards Rating

The General Ethical Standards Rating covers adherence to professional standards of conduct and ethics, reliability, diligence and other criteria relevant to the discharge of professional responsibilities.

The General Ethical Standards Rating is:

V — Very High

An attorney will not receive a Legal Ability Rating unless he or she has been endorsed for a "V". Only when both categories of ratings are confirmed will an attorney receive a rating.

All ratings are positive indicators of an attorney's ethics and professional stature. The CV® rating is a proud first rating and a definitive statement of a lawyer's above average ability and unquestionable ethics. The BV® rating is an excellent rating for the attorney with more experience. The AV® rating is a significant accomplishment — a sign that a lawyer is considered by his or her peers to be at the highest levels of professional excellence.

As a general rule, ratings are transferable within state boundaries. Ratings may also be transferred within a state, with the symbol © indicating the rating was obtained in another jurisdiction.

## PERIODIC RATING REEVALUATION

To maintain a high level of accuracy and dependability, Martindale-Hubbell conducts regular reviews of ratings. If the result does not support the published rating, it is lowered or withdrawn.

## CONFIDENTIALITY

Martindale-Hubbell treats all phases of its impartial rating process as confidential. Sources contacted participate with that understanding. Under no circumstances are any rating materials released.

## PROMOTING YOUR MARTINDALE-HUBBELL RATING IN MARKETING MATERIALS

Ratings are intended primarily for the use of lawyers in the practice of their profession and for the general public. You may reference your Martindale-Hubbell rating in printed lawyer-to-lawyer communications (such as law firm brochures), professional announcements (such as a law firm brochure), and legal directories targeted to lawyers and law firms. Listed below are the requirements for each type of communication.

• For printed lawyer-to-lawyer communications:

Include the following:

"CV, BV and AV are registered certification marks of Reed Elsevier Properties Inc., used in accordance with the Martindale-Hubbell certification procedure standards and policies."

• For printed professional announcements:

Include the certification mark reference above AND the following explanation:

"Martindale-Hubbell is the facilitator of a peer review process that rates lawyers. Ratings reflect the confidential opinions of members of the Bar and the Judiciary. MARTINDALE-HUBBELL™ ratings fall into two categories — legal ability and general ethical standards.

Legal Ability Ratings are:

C — Good to High
B — High to Very High
A — Very High to Preeminent

There is one general ethical standard rating — "V" or "very high" — and an attorney must receive it in order to be rated."

• For legal directories targeted to lawyers and law firms:

You must receive prior written consent from the Martindale-Hubbell Ratings Department AND abide by the following policies:

Print and CD-ROM based legal directories must include the certification mark reference and the rating explanation described above.

Web-based legal directories targeted at lawyers and law firms must have a link to Martindale-Hubbell's Web site page (http://www.martindale.com/company/ratings.html) which includes the approved reference and explanation.

You may not use your Martindale-Hubbell rating in print, CD-ROM, or Web-based directories targeted in whole or in part to those other than lawyers and law firms, radio or television commercials, political advertisements or promotions, outdoor advertisements (billboards, buses, benches, etc.), newspaper or yellow page advertisements, law firm Web sites, Martindale-Hubbell Lawyer HomePages or Internet banner ads.

If you'd like to publish your rating in any other format not mentioned here, prior written consent from the Martindale-Hubbell Rating Department and adherence to specific guidelines are required.

## A COOPERATIVE SERVICE TO THE BAR

Martindale-Hubbell respects the confidence the legal community has placed in its rating system. Considered an important tool used in the practice of law, the ratings are an invaluable resource for researching opposing counsel or engaging the services of another attorney. They represent a widely regarded measure of esteem that attorneys strive to achieve.

Since ratings reflect the recommendations of the legal community, we need your help to ensure the impartiality of the ratings process. When you receive an inquiry, please complete it and return it to us promptly. By doing so, you are providing a valuable service to the legal community. We extend our appreciation to every member of the legal profession who participates in this cooperative service to the Bar.

# 1995 Attorney Billing and Compensation Survey
## Final Results Summary

### Compensation and Billing--by Region

| Region | 1994 Income (Median[1]) | 1994 Hourly Rates Usual (Median[1]) | 1994 Hourly Rates Maximum (Median[1]) | Range of contingency fee arrangements in practice during 1994 Low (Median[1]) | Range of contingency fee arrangements in practice during 1994 High (Median[1]) |
|---|---|---|---|---|---|
| Houston PMSA[2] (n=310[3]) . . . . . . . . . . | $84,895 | $150 | $160 | 25% | 45% |
| Dallas PMSA (n=282) . . . . . . . . . . . . . | $94,736 | $150 | $157 | 25% | 45% |
| Ft. Worth-Arlington PMSA (n=292) . . . . | $92,948 | $150 | $150 | 25% | 45% |
| Austin-San Marcos MSA (n=264) . . . . . | $79,829 | $150 | $150 | 25% | 45% |
| San Antonio MSA (n=315) . . . . . . . . . | $72,947 | $125 | $149 | 25% | 50% |
| El Paso MSA (n=280) . . . . . . . . . . . . . | $94,078 | $137 | $150 | 25% | 43% |
| Longview-Marshall MSA, Texarkana MSA, Tyler MSA (n=311) . . . . . . . . . . | $95,237 | $125 | $148 | 25% | 45% |
| Beaumont-Port Arthur MSA, Brazoria PMSA, Galveston-TX City PMSA (n=274) . . . . . . . . . . . . . . . . . . . . . . . | $89,062 | $125 | $145 | 30% | 42% |
| Corpus Christi MSA (n=292) . . . . . . . . | $85,833 | $127 | $147 | 30% | 50% |
| Brownsville-Harlingen-San Benito MSA, Laredo MSA, McAllen-Edinburg-Mission MSA (n=251) . . . . . . . . . . . . . . . . . . . | $97,916 | $120 | $130 | 30% | 45% |
| Odessa-Midland MSA (n=210) . . . . . . . | $95,160 | $130 | $144 | 30% | 40% |
| Abilene MSA, San Angelo MSA (n=170) | $76,136 | $125 | $125 | 25% | 40% |
| Lubbock MSA (n=230) . . . . . . . . . . . . . | $88,888 | $121 | $125 | 25% | 40% |
| Amarillo MSA (n=236) . . . . . . . . . . . . . | $92,360 | $125 | $140 | 25% | 40% |
| Killeen-Temple MSA, Waco MSA (n=288) . . . . . . . . . . . . . . . . . . . . . . . | $79,847 | $120 | $125 | 25% | 40% |
| Texas Border (n=112) . . . . . . . . . . . . . | $80,555 | $125 | $125 | 33% | 40% |
| West Texas (n=314) . . . . . . . . . . . . . . . | $71,106 | $120 | $125 | 25% | 40% |
| Central Texas (n=297) . . . . . . . . . . . . . | $69,216 | $125 | $125 | 30% | 40% |
| East Texas (n=273) . . . . . . . . . . . . . . . | $79,286 | $119 | $125 | 25% | 40% |
| Texas Gulf Coast (n=233) . . . . . . . . . . | $71,249 | $121 | $125 | 30% | 45% |

[1] The median indicates that half of the responses fall at or below the median, and half of the responses fall at or above the median.

[2] Refers to Primary Metropolitan Statistical Areas (PMSAs) and Metropolitan Statistical Areas (MSAs) as defined by the U.S. Bureau of the Census.

[3] The number indicates the total number of respondents from that region. Not all respondents answered every question.

LEXSEE 2001 U.S. DIST. LEXIS 11050

**ENTERTAINMENT BY J&J, INC., Plaintiff, v. EZEQUIEL TORRES NUNO, d/b/a
MEXICO LINDO CANTINA and EZEQUIEL TORRES NUNO, Individually,
Defendants.**

Civil No. 3:01-CV-0631-H

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION

2001 U.S. Dist. LEXIS 11050

August 1, 2001, Decided
August 1, 2001, Filed

**DISPOSITION:** [*1] Plaintiff entitled to reasonable attorneys' fees equalling one-third of the statutory damage award, in addition to costs of court.

**COUNSEL:** For ENTERTAINMENT BY J&J INC, plaintiff: Thomas V Malorzo, J Michael Weston, Attorneys at Law, Bennett Weston & LaJone, Dallas, TX USA.

**JUDGES:** BAREFOOT SANDERS, SENIOR JUDGE, UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF TEXAS.

**OPINIONBY:** BAREFOOT SANDERS

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff's Motion for Judgment by Default, filed July 26, 2001. The Court's records indicate that the Clerk of the Court entered default on July 26, 2001. Upon consideration of the motion, the accompanying brief and appendices, and the relevant authorities, the Court concludes that Plaintiff has established that it is an aggrieved party as defined by the statute, and recognizes Plaintiff's election to seek statutory damages. *See* 47 U.S.C. §§ 605(d)(6), 605(e)(3)(C)(i). n1 The Court further concludes that Plaintiff is justly entitled to the maximum amount of statutory damages for Defendants' violation of this section, considering Plaintiff's loss of revenue, loss of business opportunities and goodwill, and the statute's [*2] intent to deter wrongful interception, receipt and broadcasting of the type of closed-circuit program at issue in this case.

n1 Because Plaintiff moves for default judgment only on its § 605 claim, the Court therefore makes no ruling on the related claim brought under § 553 of the same statute. Even if Defendants were found to have violated both sections of the Communications Act, Plaintiff would not be entitled to cumulative remedies. *See Cablevision Systems Corp. v. Maxie's North Shore Deli Corp.*, 1991 U.S. Dist. LEXIS 4874, 1991 WL 58350 at *2 (E.D.N.Y. Mar. 20, 1991).

The Court concludes, however, based on the Complaint and the instant motion pleadings, that Plaintiff has not established that Defendants willfully violated § 605(a), a necessary predicate to a discretionary increase of statutory damages. *See* 47 U.S.C. § 605(e)(3)(C)(ii). Without reaching whether Defendants acted for purposes of direct or indirect commercial advantage or private financial gain, the Court cannot find, based [*3] on the record before it, that Defendants had actual or constructive knowledge that his actions were unlawful.

Finally, regarding Plaintiff's request for attorneys' fees, the Court recognizes that a one-third contingent fee arrangement is standard practice in collections actions, and concludes that this case has all the earmarks of a collections action. As prevailing party, Plaintiff is therefore entitled to reasonable attorneys' fees equalling one-third of the statutory damage award, in addition to costs of court. *See* 47 U.S.C. § 605(e)(3)(B)(iii).

Judgment will be entered accordingly.

SO ORDERED.

DATED: August 1st, 2001.

BAREFOOT SANDERS, SENIOR JUDGE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

# STATE BAR OF TEXAS
## DEPARTMENT OF RESEARCH & ANALYSIS



# 2001 HOURLY RATE REPORT

*P.O. Box 12487, Austin, TX 78711 ★ (800) 204-2222 or (512) 463-1463, ext.2026 ★ research@texasbar.com*

2001 HOURLY RATE REPORT

# Table of Contents

Introduction .......................................................................................................................1

**2000 Typical Hourly Rates**
   2000 Typical Hourly Rates ..............................................................................................2
   2000 Typical Hourly Rates by Law Firm Size ...............................................................3
   2000 Typical Hourly Rates by Years of Experience.......................................................4
   2000 Typical Hourly Rates by Years of Experience and Law Firm Size .......................5
   2000 Typical Hourly Rates by Area of Practice .............................................................6

**Regional Results** ...........................................................................................................8
   2000 Typical Hourly Rates by Region...........................................................................10
   2000 Typical Hourly Rates by Region and Law Firm Size ...........................................11
   2000 Typical Hourly Rates by Region and Years of Experience ...................................12

**Methodology** .................................................................................................................13

2001 HOURLY RATE REPORT

## Introduction

Information about the economics of law practice in Texas can be a valuable competitive tool in today's environment of rapid change. As part of its on-going effort to make such information more widely available to attorneys, Texas Bar CLE and the State Bar's Department of Research and Analysis conducted the 2001 Lawyer Technology Survey. The overall goal of the survey was to assist attorneys by providing information on technology utilization, hourly rates, and compensation.

This report presents the data collected on hourly rates in private law firms. The report provides detailed breakdowns of rates by law firm size, years of experience, area of practice, and region of the state. The time frame of reference for all data is calendar year 2000.

A written questionnaire was mailed in February 2001 to a stratified random sample of some 6,000 Texas attorneys from 12 economic regions[1] of the state. The survey's response rate was 45 percent. A more detailed description of the survey's methodology and a copy of the questionnaire are included at the end of this report.

---

[1] The state was broken down into 12 economic regions based on metropolitan and non-metropolitan areas defined by the U.S. Bureau of the Census. The regions and the counties included in each appear on pages 8-9 of this report.

2001 HOURLY RATE REPORT

## 2000 Typical Hourly Rates[1]

| | |
|---|---|
| $125 or less | 14% |
| $126 to $150 | 22% |
| $151 to $175 | 18% |
| $176 to $200 | 18% |
| $201 to $225 | 6% |
| $226 to $250 | 7% |
| $251 to $275 | 4% |
| $276 to $300 | 4% |
| $301 to $325 | 1% |
| $326 to $350 | 1% |
| $351 to $375 | 2% |
| More than $375 | 3% |
| Average | $197 |
| Median | $175 |
| Most Common | $150 |
| Low | $50 |
| High | $950 |

[1] If an attorney's hourly rate varied by area of practice, a simple average rate was calculated.

2001 HOURLY RATE REPORT

## 2000 Typical Hourly Rates[1]
## By Law Firm Size[2]

| | Solos (n=310) | 2 to 5 (n=299) | 6 to 10 (n=93) | 11 to 24 (n=71) | 25 to 40 (n=56) | 41 to 60 (n=39) | 61 to 100 (n=38) | More than 100 (n=132) |
|---|---|---|---|---|---|---|---|---|
| $150 or less | 50% | 40% | 32% | 42% | 37% | 3% | 1% | 7% |
| $151 to $175 | 20% | 21% | 13% | 15% | 20% | 21% | 25% | 8% |
| $176 to $200 | 19% | 19% | 24% | 20% | 15% | 40% | 21% | 6% |
| $201 to $300 | 10% | 18% | 31% | 23% | 18% | 16% | 45% | 40% |
| More than $300 | 1% | 3% | 0% | 0% | 11% | 20% | 9% | 39% |
| Average | $168 | $188 | $182 | $174 | $197 | $235 | $231 | $287 |
| Median | $155 | $175 | $190 | $165 | $162 | $200 | $233 | $280 |
| Most Common | $150 | $150 | $200 | $150 | $150 | $200 | $195 | $350 |
| Low | $50 | $75 | $100 | $85 | $100 | $116 | $135 | $110 |
| High | $325 | $950 | $295 | $300 | $375 | $450 | $360 | $460 |

[1] If an attorney's hourly rate varied by area of practice, a simple average rate was calculated.
[2] Number of attorneys in all offices/branches.

*State Bar of Texas Department of Research and Analysis*
3

2001 HOURLY RATE REPORT

## 2000 Typical Hourly Rates[1]
## By Years of Experience[2]

| | 2 or Fewer (n = 69) | 3 to 6 (n = 143) | 7 to 10 (n = 155) | 11 to 15 (n = 159) | 16 to 20 (n = 145) | 21 to 25 (n = 123) | More than 25 (n = 219) |
|---|---|---|---|---|---|---|---|
| $150 or less | 67% | 47% | 42% | 30% | 30% | 32% | 23% |
| $151 to $175 | 13% | 21% | 22% | 19% | 13% | 10% | 23% |
| $176 to $200 | 20% | 17% | 12% | 17% | 23% | 20% | 17% |
| $201 to $300 | 0% | 11% | 17% | 23% | 25% | 30% | 27% |
| More than $300 | 0% | 3% | 8% | 11% | 9% | 7% | 11% |
| Average | $141 | $173 | $183 | $205 | $224 | $209 | $211 |
| Median | $150 | $162 | $175 | $180 | $190 | $199 | $193 |
| Most Common | $150 | $150 | $175 | $150 | $200 | $200 | $175 |
| Low | $50 | $100 | $100 | $85 | $100 | $120 | $75 |
| High | $200 | $380 | $380 | $365 | $950 | $445 | $460 |

[1] If an attorney's hourly rate varied by area of practice, a simple average rate was calculated.
[2] Based on year first licensed in any jurisdiction.

*State Bar of Texas Department of Research and Analysis*

2001 HOURLY RATE REPORT

## 2000 Typical Hourly Rates[1]
### By Years of Experience[2] and Law Firm Size[3]

| | Sole Practitioners | 2 to 5 Attorneys | 6 to 10 Attorneys | 11 to 24 Attorneys | 25 to 40 Attorneys | 41 to 60 Attorneys | 61 to 100 Attorneys | More than 100 Attorneys |
|---|---|---|---|---|---|---|---|---|
| | | | | **Law Firm Size** | | | | |
| 2 Years or Less | $125 | $125 | $125 | ** | ** | ** | $250 | ** |
| 3 to 6 Years | $150 | $150 | $169 | $150 | $148 | ** | ** | $237 |
| 7 to 10 Years | $150 | $175 | $130 | $180 | $158 | ** | $170 | $300 |
| 11 to 15 Years | $150 | $175 | $200 | $175 | ** | ** | ** | $295 |
| 16 to 20 Years | $175 | $185 | $164 | $194 | $190 | ** | ** | $343 |
| 21 to 25 Years | $162 | $200 | $219 | ** | ** | ** | ** | $400 |
| More than 25 Years | $175 | $200 | $217 | ** | ** | $250 | ** | $375 |

[1] If an attorney's hourly rate varied by area of practice, a simple average rate was calculated.
[2] Based on year first licensed in any jurisdiction.
[3] Number of attorneys in all offices/branches.

*State Bar of Texas Department of Research and Analysis*

5

2001 HOURLY RATE REPORT

## 2000 Typical Hourly Rates[1]
## By Area of Practice[2]

| | Average | Median | Most Common | Low | High |
|---|---|---|---|---|---|
| Administrative & Governmental (n = 31) | $203 | $180 | $120 | $110 | $450 |
| Alternative Dispute Resolution (n = 15) | $192 | $200 | $200 | $125 | $250 |
| Appellate (n = 31) | $183 | $175 | $225 | $110 | $250 |
| Banking (n = 68) | $247 | $225 | $225 | $100 | $400 |
| Bankruptcy: Business (n = 31) | $225 | $200 | $250 | $125 | $375 |
| Bankruptcy: Consumer (n = 21) | $220 | $175 | $175 | $100 | $500 |
| Business (n = 181) | $226 | $200 | $175 | $100 | $950 |
| Construction (n = 18) | $200 | $180 | $150 | $125 | $350 |
| Consumer-DTPA (n = 19) | $148 | $150 | $150 | $85 | $375 |
| Creditor-Debtor- (n = 16) | $153 | $150 | $138 | $100 | $225 |
| Criminal (n = 47) | $160 | $150 | $125 | $70 | $300 |
| Entertainment & Sports (n= 11) | $192 | $185 | $150 | $150 | $250 |
| Environmental & Natural Resources (n = 28) | $198 | $150 | $150 | $100 | $355 |
| Family (n = 215) | $165 | $150 | $150 | $50 | $350 |

[1] If an attorney's hourly rate varied by area of practice, a simple average rate was calculated.
[2] Area accounting for 25% or more of time practicing law and which had 10 or more respondents.

*State Bar of Texas Department of Research and Analysis*

2001 HOURLY RATE REPORT

## 2000 Typical Hourly Rates[1]
## By Area of Practice[2] (continued)

| | Average | Median | Most Common | Low | High |
|---|---|---|---|---|---|
| Health (n = 18) | $273 | $244 | $445 | $125 | $445 |
| Insurance (n = 59) | $135 | $125 | $125 | $85 | $375 |
| Intellectual Property (n = 29) | $286 | $300 | $325 | $150 | $375 |
| Labor–Employment (n = 95) | $205 | $196 | $200 | $85 | $460 |
| Litigation: General Civil (n = 265) | $192 | $179 | $200 | $50 | $450 |
| Litigation: Personal Injury[3] (n = 61) | $170 | $150 | $150 | $85 | $375 |
| Litigation: Personal Injury Defense (n = 22) | $146 | $150 | $150 | $100 | $250 |
| Litigation: Unspecified (n = 59) | $196 | $185 | $250 | $100 | $350 |
| Maritime–Admiralty (n = 13) | $259 | $250 | $250 | $100 | $380 |
| Oil & Gas (n = 24) | $177 | $175 | $125 | $110 | $275 |
| Real Estate (n = 153) | $181 | $175 | $150 | $75 | $300 |
| Taxation (n = 36) | $220 | $200 | $200 | $100 | $310 |
| Wills–Trusts–Probate (n = 170) | $178 | $175 | $150 | $75 | $325 |

[1] If an attorney's hourly rate varied by area of practice, a simple average rate was calculated.
[2] Area accounting for 25% or more of time practicing law and which had 10 or more respondents.
[3] Includes Personal Injury "Unspecified"

*State Bar of Texas Department of Research and Analysis*

7

2001 HOURLY RATE REPORT

# Survey Sampling Regions and Counties in Each Region*

**1 Houston-Galveston-Brazoria CMSA**
*Brazoria PMSA*
  Brazoria
*Galveston-Texas City PMSA*
  Galveston
*Houston PMSA*
  Chambers
  Fort Bend
  Harris
  Liberty
  Montgomery
  Waller

**2 Dallas-Fort Worth CMSA**
*Dallas PMSA*
  Collin
  Dallas
  Denton
  Ellis
  Henderson
  Hunt
  Kaufman
  Rockwall
*Fort Worth PMSA*
  Hood
  Johnson
  Parker
  Tarrant

**3 Austin-San Marcos MSA**
  Bastrop
  Caldwell
  Hays
  Travis
  Williamson

**4 San Antonio MSA**
  Bexar
  Comal
  Guadalupe
  Wilson

**5 El Paso MSA**
  El Paso

**6 Corpus Christi MSA**
  Nueces
  San Patricio

**7 Beaumont-Port Arthur MSA**
  Hardin
  Jefferson
  Orange

**8 Central Texas MSAs**
*Waco MSA*
  McLennan
*Killeen-Temple MSA*
  Bell
  Coryell

**9 East & NE Texas MSAs**
*Bryan-College Station MSA*
  Brazos
*Longview-Marshall MSA*
  Gregg
  Harrison
  Upshur
*Sherman-Denton MSA*
  Grayson
*Texarkana MSA*
  Bowie
*Tyler MSA*
  Smith
*Victoria MSA*
  Victoria
*Wichita Falls MSA*
  Archer
  Wichita

**10 South Texas MSAs**
*Brownsville-Harlingen-San Benito MSA*
  Cameron
*Laredo MSA*
  Webb
*McAllen-Edinburg-Mission MSA*
  Hidalgo

**11 West Texas MSAs**
*Abilene MSA*
  Taylor
*Amarillo MSA*
  Potter
  Randall
*Lubbock MSA*
  Lubbock
*Odessa-Midland MSA*
  Ector
  Midland
*San Angelo MSA*
  Tom Green

**12 Non-Metropolitan Counties**
  Anderson
  Andrews
  Angelina
  Aransas
  Armstrong
  Atascosa
  Austin
  Bailey
  Bandera
  Baylor
  Bee
  Blanco
  Borden
  Bosque
  Brewster
  Briscoe

2001 HOURLY RATE REPORT

# Survey Sampling Regions and Counties in Each Region (continued)

**12 Non-Metropolitan Counties (continued)**

| | | | | |
|---|---|---|---|---|
| Burleson | Fayette | Karnes | Morris | Sutton |
| Burnet | Fisher | Kendall | Motley | Swisher |
| Calhoun | Floyd | Kenedy | Nacogdoches | Terrell |
| Callahan | Foard | Kent | Navarro | Terry |
| Camp | Franklin | Kerr | Newton | Throckmorton |
| Carson | Freestone | Kimble | Nolan | Titus |
| Cass | Frio | King | Ochiltree | Trinity |
| Castro | Gaines | Kinney | Oldham | Tyler |
| Cherokee | Garza | Kleberg | Palo Pinto | Upton |
| Childress | Gillespie | Knox | Panola | Uvalde |
| Clay | Glasscock | Lamar | Parmer | Val Verde |
| Cochran | Goliad | Lamb | Pecos | Van Zandt |
| Coke | Gonzales | Lampasas | Polk | Walker |
| Coleman | Gray | La Salle | Presidio | Ward |
| Collingsworth | Grimes | Lavaca | Rains | Washington |
| Colorado | Hale | Lee | Reagan | Wharton |
| Comanche | Hall | Leon | Real | Wheeler |
| Concho | Hamilton | Limestone | Red River | Wilbarger |
| Cooke | Hansford | Lipscomb | Reeves | Willacy |
| Cottle | Hardeman | Live Oak | Refugio | Winkler |
| Crane | Hartley | Llano | Roberts | Wise |
| Crockett | Haskell | Loving | Robertson | Wood |
| Crosby | Hemphill | Lynn | Runnels | Yoakum |
| Culberson | Hill | Madison | Rusk | Young |
| Dallam | Hockley | Marion | Sabine | Zapata |
| Dawson | Hopkins | Martin | San Augustine | Zavala |
| Deaf Smith | Houston | Mason | San Jacinto | |
| Delta | Howard | Matagorda | San Saba | |
| De Witt | Hudspeth | Maverick | Schleicher | |
| Dickens | Hutchinson | McCulloch | Scurry | |
| Dimmit | Irion | McMullen | Shackelford | |
| Donley | Jack | Medina | Shelby | |
| Duval | Jackson | Menard | Sherman | |
| Eastland | Jasper | Milam | Somervell | |
| Edwards | Jeff Davis | Mills | Starr | |
| Erath | Jim Hogg | Mitchell | Stephens | |
| Falls | Jim Wells | Montague | Sterling | |
| Fannin | Jones | Moore | Stonewall | |

* Metropolitan areas as defined by Office of Management & Budget, June 1993, using 1990 Census data. Data excludes Miller County, AR, part of the Texarkana MSA.

2001 HOURLY RATE REPORT

**2000 Typical Hourly Rates[1]**
**By Region**

| | Average | Median | Most Common | Low | High |
|---|---|---|---|---|---|
| **Houston – Galveston – Brazoria CMSA (n =77)** | $215 | $180 | $200 | $50 | $950 |
| **Dallas – Fort Worth CMSA (n = 89)** | $205 | $190 | $150 | $100 | $450 |
| **Austin – San Marcos (n = 71)** | $224 | $217 | $250 | $110 | $450 |
| **San Antonio MSA (n = 91)** | $184 | $175 | $150 | $100 | $325 |
| **El Paso MSA (n = 84)** | $166 | $150 | $150 | $100 | $250 |
| **Corpus Christi MSA (n = 106)** | $170 | $164 | $150 | $85 | $375 |
| **Beaumont – Port Arthur MSA (n = 85)** | $157 | $150 | $150 | $100 | $338 |
| **Central Texas MSAs (n = 81)** | $149 | $150 | $150 | $100 | $250 |
| **East and Northeast Texas MSAs (n = 108)** | $155 | $150 | $150 | $100 | $350 |
| **South Texas MSAs (n = 78)** | $155 | $150 | $150 | $85 | $300 |
| **West Texas MSAs (n = 125)** | $158 | $150 | $150 | $95 | $250 |
| **Non-Metropolitan Counties (n=91)** | $149 | $150 | $150 | $75 | $300 |

[1] If an attorney's hourly rate varied by area of practice, a simple average rate was calculated.

2001 HOURLY RATE REPORT

## 2000 Typical Hourly Rates[1]
## By Region and Law Firm Size[2]

| | Sole Practitioners | 2 to 5 Attorneys | 6 to 10 Attorneys | 11 to 24 Attorneys | 25 to 100 Attorneys | More than 100 Attorneys |
|---|---|---|---|---|---|---|
| Houston – Galveston – Brazoria CMSA (n =77) | $175 | $175 | ** | ** | $170 | $360 |
| Dallas – Fort Worth CMSA (n = 89) | $175 | $175 | $194 | ** | $200 | $243 |
| Austin – San Marcos (n = 71) | $178 | $198 | ** | ** | $245 | $289 |
| San Antonio MSA (n = 91) | $150 | $163 | ** | $185 | ** | ** |
| El Paso MSA (n = 84) | $150 | $173 | ** | $150 | $175 | ** |
| Corpus Christi MSA (n = 106) | $150 | $175 | $175 | $150 | $136 | ** |
| Beaumont – Port Arthur MSA (n = 85) | $150 | $150 | $150 | ** | $150 | ** |
| Central Texas MSAs (n = 81) | $150 | $150 | ** | $140 | ** | ** |
| East and Northeast Texas MSAs (n = 108) | $150 | $150 | $150 | $150 | ** | ** |
| South Texas MSAs (n = 78) | $150 | $150 | ** | $140 | ** | ** |
| West Texas MSAs (n = 125) | $150 | $140 | $175 | $150 | $188 | ** |
| Non-Metropolitan Counties (n= 91) | $150 | $150 | ** | ** | ** | ** |

[1] If an attorney's hourly rate varied by area of practice, a simple average rate was calculated.
[2] Number of attorneys in all offices/branches.

State Bar of Texas Department of Research and Analysis

11

2001 HOURLY RATE REPORT

## 2000 Typical Hourly Rates[1]
## By Region and Years of Experience[2]

| | 6 Years or Fewer | 7 to 10 Years | 11 to 15 Years | 16 to 20 Years | 21 to 25 Years | More than 25 Years |
|---|---|---|---|---|---|---|
| Houston – Galveston – Brazoria CMSA (n = 77) | $150 | $175 | ** | ** | ** | $200 |
| Dallas – Fort Worth CMSA (n = 89) | $168 | ** | $197 | $200 | ** | $225 |
| Austin – San Marcos (n = 71) | $188 | $228 | $200 | ** | $225 | $245 |
| San Antonio MSA (n = 91) | $161 | ** | $173 | $180 | $180 | $184 |
| El Paso MSA (n = 84) | $130 | ** | ** | $150 | $193 | $190 |
| Corpus Christi MSA (n = 106) | $130 | $150 | $155 | $175 | $150 | $188 |
| Beaumont – Port Arthur MSA (n = 85) | $139 | $150 | $148 | $150 | ** | $155 |
| Central Texas MSAs (n = 81) | $125 | ** | $150 | $150 | $150 | $150 |
| East and Northeast Texas MSAs (n = 108) | $125 | $135 | $150 | $160 | $150 | $188 |
| South Texas MSAs (n = 78) | $125 | $156 | ** | $148 | $175 | $165 |
| West Texas MSAs (n = 125) | $125 | $150 | $154 | $160 | $175 | $163 |
| Non-Metropolitan Counties (n = 91) | ** | $125 | $150 | $150 | $150 | $150 |

[1] If an attorney's hourly rate varied by area of practice, a simple average rate was calculated.
[2] Based on year first licensed in any jurisdiction.

*State Bar of Texas Department of Research and Analysis*

12

# Methodology

## Data Collection and Sampling Procedures

Hourly rate information was collected on the 2001 Lawyer Technology Survey, a project sponsored by Texas Bar CLE. The written questionnaire (see copy at end of report) was mailed Bulk Rate on February 19, 2001 to a sample of attorneys licensed by the State Bar of Texas who were residing in-state, maintaining active membership in the State Bar of Texas, and who were not exempt from MCLE requirements. A reminder postcard was sent by first class mail on March 8, 2001 to the 3,966 attorneys who had not responded by that date.

Because the survey's results were to be presented by geographic region, the sample was stratified, or subgrouped, into 12 economic areas that were based on metropolitan and non-metropolitan areas defined by the U.S. Bureau of the Census. A sample size of 6,000—500 attorneys from each region—was set based on budget constraints, the need to have adequate samples from the less populous regions of the state, an aspirational response rate of 50 percent, and the knowledge that some attorneys would have to be dropped from the sample due to bad addresses, refusals to participate, and related factors. Results reported for all respondents and results broken out by any factor other than region were weighted so that the regional breakdown of respondents matched the regional distribution of Texas attorneys who met the sampling criteria. Weighting procedures are described in more detail below.

## Response Rate

Eight attorneys had moved out-of-state between the time of initial sampling and mailing and were dropped, resulting in a sample size of 5,992. An additional 33 were dropped from the sample due to bad addresses that could not be resolved, and eight refused to participate, resulting in a final working sample size of 5,951. As of the May 8, 2001 cutoff date, 2,668 completed questionnaires were returned to the State Bar of Texas, for an overall response rate of 45 percent. Response rates for each sampling region are shown in the table below.

## 2001 HOURLY RATE REPORT

**Methodology (continued)**

| Sampling Region | Original Sample | Dropped Due to Being Out-of-State[1] | Dropped Due to Bad Addresses | Refusals[2] | Working Sample Size | Number of Responses[3] | Response Rate |
|---|---|---|---|---|---|---|---|
| Houston-Galveston-Brazoria CMSA | 500 | 1 | 4 | 0 | 495 | 193 | 39% |
| Dallas-Fort Worth CMSA | 500 | 2 | 4 | 1 | 493 | 221 | 45% |
| Austin-San Marcos MSA | 500 | 1 | 5 | 0 | 494 | 218 | 44% |
| San Antonio MSA | 500 | 0 | 1 | 0 | 499 | 210 | 42% |
| El Paso MSA | 500 | 3 | 1 | 1 | 495 | 206 | 42% |
| Corpus Christi MSA | 500 | 0 | 2 | 1 | 497 | 208 | 42% |
| Beaumont-Port Arthur MSA | 500 | 0 | 3 | 2 | 495 | 205 | 41% |
| Central Texas MSAs | 500 | 1 | 2 | 1 | 496 | 236 | 48% |
| East & Northeast Texas MSAs | 500 | 0 | 3 | 1 | 496 | 226 | 46% |
| South Texas MSAs | 500 | 0 | 3 | 0 | 497 | 184 | 37% |
| West Texas MSAs | 500 | 0 | 2 | 0 | 498 | 230 | 46% |
| Non-Metro Counties | 500 | 0 | 3 | 1 | 496 | 212 | 43% |
| Region Unknown | 0 | 0 | 0 | 0 | 0 | 119 | — |
| *Total* | *6,000* | *8* | *33* | *8* | *5,951* | *2,668* | *45%* |

[1] Attorney had moved between time sample was drawn and mailing of questionnaire.
[2] As indicated on survey response cards (see end of report for survey materials).
[3] Based on county provided by respondents on questionnaire item number 30.

2001 HOURLY RATE REPORT

## Methodology (continued)

### Weighting Procedures

All results presented for the state as a whole or broken down by any factor other than region were weighted to reflect the known geographic distribution of attorneys who met the sampling criteria. The coding of a respondent's sampling region was based on their response to question 30, "In which Texas county is your office located?"[1] The weighting factors are shown in the table below.

| | Attorneys in Region as Percent of In-State Total[2] | Percent of Total Responses | Weighting Factor |
|---|---|---|---|
| Houston-Galveston-Brazoria CMSA | 31.3% | 7.6% | 4.12 |
| Dallas-Fort Worth CMSA | 29.7% | 8.7% | 3.41 |
| Austin-San Marcos MSA | 12.2% | 8.6% | 1.42 |
| San Antonio MSA | 7.4% | 8.2% | .90 |
| El Paso MSA | 1.7% | 8.1% | .21 |
| Corpus Christi MSA | 1.6% | 8.2% | .20 |
| Beaumont-Port Arthur MSA | 1.3% | 8.0% | .16 |
| Central Texas MSAs | 1.3% | 9.3% | .14 |
| East & Northeast Texas MSAs | 3.0% | 8.9% | .34 |
| South Texas MSAs | 2.3% | 7.2% | .32 |
| West Texas MSAs | 3.4% | 9.0% | .38 |
| Non-Metro Counties | 5.1% | 8.3% | .61 |

[1] 119 respondents did not answer this question and were not included in calculation of the weighting factors.

[2] In-state, active status attorneys, not exempt from MCLE.



**Altman Weil, Inc.**

| | ABOUT | SERVICES | PRODUCTS | NEWS & EVENTS | CAREERS | CONTA |

## ˅ NEWS & EVENTS | ✦✦

Altman Weil Leadership
Seminars
Speaking Engagements
- Consultants Presentations
Press Releases
Special Reports and
Surveys
- "Flash" Survey on Law
  Firm General Counsel
- Special Report to Legal
  Management
- Altman Weil Survey: Outside
  Directors in Large Law Firms
- Lex Mundi 2002
  Corporate Counsel Survey
- Chief Legal Officer
  Survey
- Chief Legal Officer
  Europe Survey
Altman Weil Poll Archive

➡ **Sign up now to receive the
Altman Weil Direct newsletter**

 Home

---

### PRESS RELEASE

**Altman Weil, Inc.**

## News from Altman Weil, Inc.
### For immediate release - 7/8/03

Contact(s):

William F. Brennan
Altman Weil, Inc.
610.886.2000
bbrennan@altmanweil.com

### LAW FIRM PROFITS UP DESPITE UNCERTAIN ECONOMY, SURVEY REPORTS

The newly released *Altman Weil 2003 Survey of Law Firm Economics* reports profits per equity partner in U.S. law firms were up by 9.8% in 2002. This reflects a combination of increased revenue and lower overhead.

"Overall the results were surprisingly good for law firms in 2002 considering the state of the economy," notes Altman Weil's Bill Brennan. "This is the result of law firms becoming more sophisticated in managing their practices since the last economic downturn of the early '90s.

"On the one hand, we're seeing better tactics, such as more effective collections policies, more thoughtful hiring strategies and a certain amount of belt-tightening, while on the other hand there is an ongoing commitment to long-term strategies. Law firms that find this balance will remain strong despite economic turbulence."

**Revenue**
The Survey reports national average revenue per equity partner in firms of all sizes rose 3.6% in 2002 to $822,814. Revenue, on a cash basis of accounting, per lawyer in all firms was $371,607, up 2.2% from the previous year.

As expected, larger firms fared better than smaller firms. The average firm with over 150 lawyers reported revenue per lawyer of $457,088 compared to only $292,100 for firms with fewer than 9 lawyers. The two practice areas that had the highest average gross receipts per lawyer were Plaintiff's Contingency Litigation and Intellectual Property, with $589,735 and $554,018, respectively.

**Expenses**
Average total expense per equity partner (exclusive of shareholder

compensation in professional corporations) decreased slightly to $472,757 down by .6%, according to the Survey. Overhead per lawyer (exclusive of all lawyer compensation) was $152,562, a 1.6% decrease from 2001. While most law firm expenses decreased on average or rose only slightly, the cost of malpractice insurance jumped by 29.4% for firms nationwide.

**Profitability**

Profits per equity partner were reported at an average $350,057 for all law firms in 2002, with firm income per lawyer at $219,045. The most profitable practice area was Intellectual Property according to the Survey, with profits per equity partner averaging $544,349. Regionally, equity partners in the South Atlantic region showed the highest profits, while partner profits in the Pacific region took the hardest hit, down 24.3% from 2001.

Improved realization rates also contributed to improved profitability numbers. The Survey reports a 1% increase overall from 90.1% realization in 2001 to 91.1% in 2002. The average value of fees receivable at year-end per equity partner decreased 3.3% in the same time period.

**Hours/Rates**

Equity partners recorded a median 1,729 billable hours in 2002 according to the Survey, while associates recorded 1,869 billable hours. Lawyers in the largest U.S. law firms recorded the most billable hours, with equity partners at firms with over 150 lawyers recording a median 1,820 hours and associates in the same category recording 1,969 hours.

The median hourly billing rate for equity partners was $250/hour and for associates $170/hour. Rates varied by region, with the highest hourly rates for partners and associates reported in the Middle Atlantic region.

**Compensation**

The Survey reports national median total compensation (cash compensation plus benefits) for equity partners at $246,799 and for associates at $109,419. The median starting salary plus bonus for new graduates was $70,350 in 2002, virtually unchanged for the second year in a row. New graduates in law firms with over 150 lawyers fared best, bringing home a median $95,000 in their first year compared with $65,000 for new grads at firms with 21-40 lawyers.

**The Survey**

The *Survey of Law Firm Economics* has been published annually since 1972 by Altman Weil Publications, a subsidiary of Altman Weil, Inc., a legal management consultancy headquartered in suburban Philadelphia. The Survey reports on law firm revenues and expenses, billable hours, overhead, margin, billing rates, leverage, compensation and more. It enables law firms to compare performance data with peer firms in similar size, geographic area and practice category.

This year's Survey contains information from 17,452 lawyers from 360 U.S. law firms, including 9,226 partners/shareholders, 7,495 associates and 731 active counsel. Data was collected in the spring of 2003 and reports 2002 performance.

The Survey can be purchased for $725 from Altman Weil Publications. The *2003 Altman Weil Small Law Firm Economic*

*Survey*, which contains data from participating firms with one to fifteen lawyers, is available for $395. Orders and inquiries can be made by calling 888-782-7297 toll free or by visiting the firm's online store at **https://store.altmanweil.com.**

Altman Weil Publications conducts and publishes numerous surveys of the legal profession including the *Managing Partner and Executive Director Survey*, the *Retirement and Withdrawal Survey for Private Law Firms* and the *Survey of Compensation Systems in Private Law Firms*. For additional information visit our website at **www.altmanweil.com.**

**Back to top**

Next >>

**Back to Press Releases**

Copyright © 2001-2004 Altman Weil, Inc.

LEXSEE 2003 U.S. DIST. LEXIS 10315

**NATIONAL SATELLITE SPORTS, INC., Plaintiff, VS. NANCY DEL CARMEN GARCIA d/b/a LA GUIRA NIGHT CLUB, Defendant.**

**Civil Action No. 3:01-CV-1799-D**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**2003 U.S. Dist. LEXIS 10315**

**June 18, 2003, Decided**
**June 18, 2003, Filed**

**DISPOSITION:** [*1] Plaintiff's motion for summary judgment granted.

**LexisNexis (TM) HEADNOTES– Core Concepts:**

**COUNSEL:** For Entertainment By J&J Inc, Plaintiff: Thomas V Malorzo, LEAD ATTORNEY, Byford Malorzo & Tapscott, Lewisville, TX.

For National Satellite Sports, Inc., Plaintiff: Andrew R Korn, LEAD ATTORNEY, Korn Bowdich & Diaz, Dallas, TX.

For National Satellite Sports, Inc., Plaintiff: J Michael Weston, Bennett Weston & LaJone, Dallas, TX.

Nancy Del Carmen Garcia, Defendant, Pro se, Dallas, TX.

**JUDGES:** SIDNEY A. FITZWATER, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** SIDNEY A. FITZWATER

**OPINION:**

MEMORANDUM OPINION AND ORDER

Plaintiff National Satellite Sports, Inc. ("National") moves for summary judgment against defendant Nancy Del Carmen Garcia ("Garcia"), individually and d/b/a La Guira Night Club ("La Guira"), for violation of the Federal Communications Act of 1934, 47 U.S.C. §§ 151–614 (the "FCA"), which prohibits piracy of radio and television signals. National requests statutory damages, damages for a willful act, and reasonable attorney's fees and costs. Garcia has not responded to the motion. n1 The court grants the motion to the extent of holding that Garcia is liable to National for some of the relief that National [*2]

seeks.

n1 National filed its motion on May 2, 2003. Garcia's response was due May 22, 2003. See N.D. Tex. Civ. R. 7.1(e).

I

As noted, Garcia has not responded to National's motion. Although the court may not enter a "default" summary judgment, it may accept as true the undisputed evidence that National has adduced. See, e.g., Tutton v. Garland Indep. Sch. Dist., 733 F. Supp. 1113, 1117 (N.D. Tex. 1990) (Fitzwater, J.). National had the right to exhibit the closed-circuit telecast of the January 16, 1999 championship boxing match between Mike Tyson and Francios Botha, from the MGM Grand in Las Vegas, Nevada, including undercard bouts (collectively, the "Event"), at closed-circuit locations throughout the state of Texas, including at the La Guira. On January 16, 1999 Garcia enabled the patrons at the La Guira to view a tape delayed broadcast of the Event. n2 An investigator acting for National was also present. Garcia did not pay the required license fee, and National did not authorize her [*3] to intercept, receive, or transmit the communication of the Event.

n2 A tape-delayed broadcast without authorization is still a violation of the FCA. See Kingvision Pay Per View, Ltd. v. Julian Corp., 1996 U.S. Dist. LEXIS 12539, 1996 WL 496600 at *3 *N.D. Ill. Aug. 29, 1996).

National asserts claims against Garcia for willful violations of 47 U.S.C. §§ 553 and 605 and now moves for summary judgment.

II

2003 U.S. Dist. LEXIS 10315, *3

Because National will have the burden of proof at trial on these claims, to obtain summary judgment it "must establish 'beyond peradventure all of the essential elements of the claim[.]'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). National has met this burden. It has introduced a copy of the license agreement and affidavits that establish that it is in the business of marketing and licensing commercial exhibitions of pay-per-view [*4] prizefight events; that it possessed the proprietary rights to exhibit and sublicense the right to exhibit the closed-circuit telecast of the Event to commercial establishments such as the La Guira; and that it was licensed to exhibit the Event at closed-circuit locations throughout the state of Texas. The record reflects that the Event was available in the state of Texas only to commercial establishments through an agreement with National. National electronically coded and/or scrambled the interstate satellite transmission of the Event. The only way to view the Event was by obtaining the electronic decoding equipment or satellite coordinates necessary to receive the signal.

National has introduced undisputed evidence through requests for admissions to which Garcia failed to object and are therefore deemed admitted. *See* Fed. R. Civ. P. 36(a); *Hulsey v. Texas*, 929 F.2d 168, 171 (5th Cir. 1991). Based on these admissions National has proved the following essential elements of its FCA claims: (1) Garcia did not order the Event or pay the license fee to exhibit the Event at the La Guira; (2) she intercepted and exhibited the Event at the La Guira without authorization; [*5] (3) she knew she exhibited the Event illegally; (4) she was aware that a license fee had to be paid to exhibit the Event at the La Guira; (5) she advertised the Event and required its patrons to pay cover charge; (6) she is an owner and manager of the La Guira and was present the night of the Event; (7) she exhibited the event for her financial gain and derived an economic benefit from exhibiting the Event; and (8) she intentionally and willfully broadcast the Event at the La Guira knowing she did not have authorization to do so.

National has demonstrated through undisputed summary judgment evidence that Garcia is liable. Garcia has offered no evidence or response to National's motion and has failed to present a genuine issue of material fact.

III

Having determined that Garcia is liable under the FCA, the court must decide the relief to which National is entitled.

A

National requests statutory damages in the amount of $10,000. Upon proof of a violation of 47 U.S.C. § 605(a), the plaintiff is entitled to recover either actual damages and loss of profits or statutory damages of not less than $1,000 nor more than $10,000, "as the court considers just." [*6] 47 U.S.C. § 605(e)(3)(C)(i)(II). "In exercising its discretion to award damages, this court should consider both the nature of the violation in light of the statutory scheme involved, as well as the particular circumstances concerning the defendant's actions[.]" *Cablevision Sys. N.Y. City Co. v. Lokshin*, 980 F. Supp. 107, 113 (E.D.N.Y. 1997). Considering National's loss of revenue, loss of business opportunities and goodwill, and "the statute's intent to deter wrongful interception, receipt and broadcasting of the type of closed-circuit program at issue in this case," *Entertainment By J&J, Inc. v. Nuno*, 2001 U.S. Dist. LEXIS 11050, 2001 WL 896941, at * 1 (N.D. Tex. Aug. 1, 2001) (Sanders, J.), the court concludes that National is entitled to $10,000, the full amount of statutory damages.

B

National also requests damages of $100,000 for willful acts. "In any case in which the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory, by an amount of not more than $100,000 for each [*7] violation[.]" 47 U.S.C. § 605(e)(3)(C)(ii). The facts deemed undisputed as a result of Garcia's failure to respond to National's requests for admission clearly establish that Garcia's violation of the FAC was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain. The court therefore concludes that the additional sum of $30,000 should be awarded.

C

Finally, National requests an award of attorney's fees and costs in the amount of one-third of the actual and additional damages awarded for the prosecution of this action. National also seeks a contingent award of additional attorney's fees in the event certain post-trial, pre-appeal, and appellate services are rendered and do not lead to a reversal of the judgment of this court. Under 47 U.S.C. §§ 553(c)(2)(C) and 605(e)(3)(B)(iii) National is entitled to recover its reasonable attorney's fees and costs.

The court declines to award contingent attorney's fees and costs. National may apply for such an award if and when such fees and costs are incurred. State courts make such awards because state trial courts are the tribunals that make factual [*8] findings and they must award post-trial court and appellate fees before they lose their

jurisdiction to do so. Federal district courts do not oper-
ate under similar jurisdictional restraints. Therefore, this
court uniformly denies post-trial court appellate fee re-
quests, without prejudice to awarding them on a subse-
quent application that is based on the actual fees incurred.

National seeks a fee award of one-third of the ac-
tual and additional damages based on its contingent fee
agreement with National. The contingent nature of the
fee, however, is only one factor to be considered in de-
termining a reasonable fee. *See Johnson v. Ga. Highway
Express, Inc.*, 488 F.2d 714, 718 (5th Cir. 1974). The
court concludes that National should recover a fee based
on the hours expended and a reasonable hourly rate, which
National seeks in the alternative. Its undisputed evidence
shows that this sum is $5,000 (20 hours times $250 per
hour).

For the reasons set out, the court grants National's
motion for summary judgment as set forth above. A judg-
ment will be filed contemporaneously with the filing of
this memorandum opinion and order.

**SO ORDERED.**

June 18, 2003.

SIDNEY A. [*9] FITZWATER

UNITED STATES DISTRICT JUDGE

**JUDGMENT**

For the reasons set out in a memorandum opinion
and order filed today, it is ordered and adjudged that
plaintiff National Satellite Sports, Inc. ("National") re-
cover judgment against defendant Nancy Del Carmen
Garcia ("Garcia"), individually and d/b/a La Guira Night
Club ("La Guira"), in the principal sum of $40,000, to-
gether with attorney's fees in the sum of $5,000, and post-
judgment interest at the rate of 0.97% per annum.

National's taxable costs of court, as calculated by the
clerk of court, are assessed against Garcia.

Done at Dallas, Texas this 18th day of June, 2003.

SIDNEY A. FITZWATER

UNITED STATES DISTRICT JUDGE